PRUDENTIAL OIL CORPORATION,
Plaintiff-Appellee,

v.

PHILLIPS PETROLEUM COMPANY,
Defendant-Appellant.

No. 324, Docket 76–7207.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1976.

Decided Dec. 1, 1976.

**470**

Robert MacCrate, New York City (David B. Rigney, Richard J. Urowsky, Sullivan & Cromwell, New York City, Lloyd G. Minter, C. J. Roberts, Don Jemison, Phillips Petroleum Co., Bartlesville, Okl., of counsel), for defendant-appellant.

Thomas R. Farrell, New York City (Leonard M. Marks, Gold, Farrell & Marks, Abrams & Sassower, New York City, of counsel), for plaintiff-appellee.

Before FEINBERG, MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal raises the question of whether federal diversity jurisdiction may be acquired through the assignment by a non-diverse parent corporation of its claim to a newly-created, 100 percent owned diverse subsidiary, which owns no other assets and is engaged solely in the prosecution of the claim. In this case the parent, Prudential Equities, a Delaware corporation ("Prudential-Delaware"), assigned its claim against appellant Phillips Petroleum Company ("Phillips"), also a Delaware corporation, to Prudential Oil Corporation ("Prudential-New York"), a New York corporation which is a wholly owned subsidiary of Prudential-Delaware and the plaintiff in the action. If the assignment was effective for federal jurisdictional purposes, the diversity of citizenship necessary under 28 U.S.C. § 1332(a) would exist; if not, the action must be dismissed. We hold that because the material undisputed facts show that the assignment served only the function of creating an appearance of diversity jurisdiction and the plaintiff failed to demonstrate a legitimate business reason for the transfer, the complaint must be dismissed for lack of federal jurisdiction pursuant to Title 28 U.S.C. § 1359, which provides:

> "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

Prudential-New York, invoking federal diversity jurisdiction, commenced the present action in the Southern District of New York on September 27, 1967, by filing a complaint alleging four claims arising out of Phillips' successful 1965 negotiation with the Department of Interior for an oil import quota which enabled Phillips to construct and operate a multi-million dollar petrochemical plant in Puerto Rico. The plaintiff alleged, *inter alia,* that Phillips had completed the project for its own exclusive benefit in breach of a joint venture agreement with plaintiff's predecessor in interest

and that Phillips had also tortiously misappropriated certain of the predecessor-in-interest's business concepts. An accounting, equitable relief and damages were sought, partly on the theory that a constructive trust should be impressed upon Phillips' Puerto Rican facility in favor of the plaintiff.

Following commencement of the lawsuit it lay virtually dormant for two years. On October 9, 1973, Phillips moved to strike the plaintiff's jury demand, a motion that was decided by Chief Judge Edelstein on April 5, 1975, 392 F.Supp. 1018. On June 17, 1975, Judge Charles L. Brieant, to whom the case was transferred, denied defendant's motion to dismiss the action for lack of subject matter jurisdiction pursuant to § 1359, 398 F.Supp. 233. Trial before Judge Brieant and a jury finally commenced on January 5, 1976. At the close of the plaintiff's case Judge Brieant dismissed the plaintiff's joint venture claims and those seeking equitable relief but permitted the plaintiff to amend the complaint to seek damages based on quasi-contract or an implied-in-fact agreement by Phillips to compensate plaintiff's predecessor for its business concepts and for Phillips' misappropriation and use of those concepts.

On January 27, 1976, the jury rendered a verdict in favor of Prudential-New York, awarding $1,500,000 damages which, based on the jury's answers to special questions, was founded on the theory that on December 16, 1963, Phillips either had tortiously misappropriated business concepts devised by plaintiff's predecessor for use in obtaining the oil import quota or had impliedly agreed to pay for them. Judge Brieant assessed interest from December 16, 1963, bringing the total judgment to $2,690,-968.70.

Phillips attacks the judgment on three grounds: (1) that Prudential-Delaware's assignment of the claims to Prudential-New York violated 28 U.S.C. § 1359, (2) that the verdict was excessive and unsupported by competent evidence, and (3) that the calculation of pre-judgment interest from December 16, 1963, which amounted to some $1,200,000, was contrary to New York law. Since we find that the action must be dismissed on the first of these grounds it becomes unnecessary to consider the other two. Accordingly we focus our attention principally on those facts pertaining to the question of whether the assignment of the claims in issue violated § 1359.

Beginning in 1961 the Commonwealth of Puerto Rico, which had no oil sources of its own, made it known that it desired to expand its economy by obtaining from the U.S. Department of Interior, which then administered the United States' oil import program, an oil import quota that would enable Puerto Rico to build a third oil refinery for use in expansion of industry in the territory, particularly the manufacture of petrochemicals. Various promoters became interested, including Jack P. Coan of Omega Management, Inc., his consulting firm; Oscar L. Chapman, former Secretary of the Interior; Bruce K. Brown, an oil executive; Nathan M. Shippee and Edward J. Wiley, Chairman and President, respectively, of Prudential Oil Corporation, then a Connecticut company engaged in selling oil drilling operations; and Robert B. Anderson, former Secretary of the Treasury.

In the early years, Coan and Chapman, working with Shippee and Anderson, sought to interest Phillips in a project that would form the basis for obtaining the oil import quota, with Phillips acting as a supplier of oil to a proposed refinery in Puerto Rico and as a purchaser of refined petroleum produced by the plant that would not be used in Puerto Rican petrochemical operations. In 1963 Phillips indicated willingness to participate in and to provide advice for the construction of the project, but by March 1963 the promoters were advised by the Economic Development Administration of Puerto Rico ("EDA") that the project was disapproved. In April 1963 Phillips informed Prudential-Connecticut that it would not participate unless Prudential succeeded in obtaining an oil import quota. Prudential's efforts were further frustrated when, on July 2, 1963, Shippee, its Chairman, was involved in an airplane accident

which rendered him unable to continue his promotional efforts.

Beginning in August 1963 Chapman and Coan reactivated Phillips' interest, this time on the basis that Phillips would directly sponsor a Puerto Rican refinery designed to stimulate petrochemical production in Puerto Rico. Toward the end of 1963 they submitted a new proposal to EDA for a petrochemical-oriented plant and in January 1964, Chapman, acting for Phillips, and with the support of EDA, applied to the Department of the Interior for an oil import quota. Over the opposition of competing oil companies and after a public hearing, an agreement was negotiated in the spring of 1965 with the Commonwealth of Puerto Rico for the project, which resulted in the grant of the necessary oil import quota allocation by the Department of the Interior in December 1965.

In the meantime on March 1, 1965, Prudential-Delaware was organized. On June 30, 1965, it took over the assets, liabilities and business operations of Prudential-Connecticut, which was thereupon dissolved. Beginning in December 1965, Prudential-Delaware, acting through Shippee and Anderson, sought to reach an agreement with Phillips for the joint operation of the Puerto Rican project but Phillips denied any obligation to share the venture with Prudential-Delaware. In the course of these negotiations Shippee at a May 1966 meeting exhibited to Phillips' representatives a draft of a state court complaint on behalf of Prudential-Delaware against Phillips, also a Delaware corporation, bearing the caption "Supreme Court of the State of New York, New York County" and containing allegations similar to those later set forth in the complaint in the present federal court action, including the claim that Prudential-Delaware had an equity interest in Phillips' Puerto Rican project. By letter dated June 9, 1966, Phillips, rejecting Prudential-Delaware's claim, denied that it had any obligations to Prudential-Delaware and terminated the negotiations.

Within a few weeks after termination of the negotiations Prudential-Delaware, which had already formed two subsidiaries in the spring of 1966, America House, Inc., a Spanish corporation, for the development of a shopping and building complex in Spain and Prudential Polymer Co., a Puerto Rican company, to engage in petrochemical-related activities in Puerto Rico, further reorganized itself, obtaining the approval of its directors on June 29, 1966, and of its stockholders on July 13, 1966. It changed its name to Prudential Equities Corp. and distributed its assets to two newly-created, wholly owned subsidiaries: Prudential Funds, Inc., a Delaware corporation formed to hold assets relating to its oil and gas drilling ventures with a view to the making of a public offering and Prudential Land Company, Inc., a New York subsidiary, formed to hold title to its lease holdings and operate in the field of real estate management and acquisitions.

After this reorganization the sole remaining asset held by Prudential-Delaware was its claim against Phillips, which had been the subject of the state court complaint exhibited during its unsuccessful negotiations with Phillips. For no apparent reason than to divorce itself of ownership of this claim, on July 12, 1966, Prudential-Delaware created a wholly-owned subsidiary, Prudential-New York, later to become the plaintiff in this action, to which it assigned its interest in the Phillips petrochemical project in Puerto Rico and any "claims, rights, or causes of action accruing or arising" out of the alleged joint venture with Phillips. Since the negotiations for the joint venture with Phillips had all but terminated, Prudential-Delaware owned no interest in the Phillips project; Prudential held only the claim against Phillips, which it transferred to its wholly owned subsidiary, Prudential-New York. The sole officers of the new subsidiary were Shippee and his secretary.

Since its formation in 1966 Prudential-New York has maintained no books of account. In response to interrogatories in this action it conceded that its "sole business . . . is the prosecution of this action" against Phillips which has been

maintained "to recover the property rights of Prudential-Delaware in and to the petrochemical complex in Puerto Rico presently administered by Phillips Petroleum Company." That Prudential-Delaware considers its wholly owned New York subsidiary to be its alter ego in the prosecution of the present lawsuit is evidenced by an October 3, 1966, resolution of the Delaware parent's board of directors authorizing and directing its officers to commence the lawsuit against Phillips "in *the name of*" its subsidiary, Prudential-New York, "at such times as they deemed it advisable and *in the best interests of Prudential-Delaware.*" (Emphasis added).

All efforts to compromise the claim against Phillips having failed, on September 27, 1967, Prudential-New York commenced the present action in the Southern District of New York.

In its answer to the complaint Phillips alleged as a defense that Title 28 U.S.C. § 1359 barred the court from acquiring subject matter jurisdiction. On December 1, 1969, Prudential-New York, faced with two intervening decisions, one by the Supreme Court in *Kramer v. Caribbean Mills,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), and the other by this court in *O'Brien v. Avco Corp.,* 425 F.2d 1030 (2d Cir. 1969), both of which shed doubt on the existence of federal jurisdiction, commenced a duplicate action against Phillips in the Supreme Court of the State of New York, New York County, Index No. 18661/69, by serving a complaint identical to the one in the present suit except for jurisdictional allegations, thus protecting itself against being time-barred in the state court if its federal suit should be dismissed for lack of jurisdiction. On January 16, 1970, the proceedings in the state action were stayed pending final disposition of this case.

On April 3, 1975, Phillips moved to dismiss the present action for lack of jurisdiction, claiming that Prudential-New York had been collusively made a party to the suit in order to create diversity jurisdiction. In a reasoned opinion, 398 F.Supp. 233,

Judge Brieant decided that the test for determining collusiveness in violation of § 1359 was whether the assignment was "made for a bona fide business purpose, wholly apart from acquiring Federal jurisdiction over the instant claim." Without an evidentiary hearing, which was waived by the parties, or any finding as to whether the creation of federal diversity jurisdiction was the aim or object of the assignment, he inferred from admissions, answers to interrogatories, concessions of counsel and undisputed affidavits, that since the reorganization undertaken by Prudential-Delaware in 1966 had a bona fide purpose the assignment of the claim was not collusive. Under the reorganization Prudential-Delaware assigned particular projects or operations to separate single-purpose, compartmentalized subsidiaries. Its drilling program, for instance, was transferred to Prudential Drilling Funds, Inc., a Delaware subsidiary, to facilitate a possible future public offering of shares in that program on the basis of a subsidiary's clean balance sheet.

Judge Brieant reasoned that, although Prudential-New York's sole asset as a result of the assignment to it became the claim against Phillips and "its sole business activity—the prosecution of the claim," which would not require anything more than "caretaker efforts of the staff of the parent corporation which had its principal place of business in New York," there remained the possibility of an amicable resolution of the dispute during the 14-month period from July, 1966, to September, 1967, when the present federal action was begun and therefore the prosecution of this federal action "was not the necessary consequence at the time the assignment was made." At the same time he wisely observed that his decision on this issue was based solely upon documents which we were in as good a position as he to interpret and suggested appellate review, stating:

"In reaching the conclusion that the assignment was not collusive, this Court has drawn inferences from uncontested facts demonstrated by admissions, answers to interrogatories, concessions of

counsel made in Court, and affidavits, the veracity of which are not seriously traversed. In doing so, we are reaching conclusions from facts, rather than finding facts. Under the latter circumstance, our determination would be valid, and binding in the event of appellate review unless 'clearly erroneous.' Rule 52(a), F.R.Civ.P. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Biderman v. Morton,* 507 F.2d 396 (2d Cir. 1974). But here, an appellate court will be equally able to draw the inferences. As the Court of Appeals noted in *Dopp v. Franklin National Bank,* 461 F.2d 873, 879 (2d Cir. 1972):

> " 'This is not a case . . . where there was an evidentiary hearing below and the credibility of witnesses played an essential part in the district judge's determination. We are in as good a position as the district judge to read and interpret the pleadings, affidavits and depositions and thus have broader discretion on review.' " (398 F.Supp. at 239).

From this decision Phillips appeals.

## DISCUSSION

For many years prior to the 1948 enactment of Title 28 U.S.C. § 1359, Congress recognized the necessity of carefully scrutinizing transfers or assignments which might have the effect of creating federal diversity jurisdiction. Section 11 of the Judiciary Act of 1789, 1 Stat. 79, denied federal jurisdiction in a suit with respect to "any promissory note or other chose in action" by an assignee "unless such suit might have been prosecuted in such court . . . if no assignment had been made." In 1875 Congress enacted an expanded version of the statute, 18 Stat. 470, which authorized a district court to dismiss an action when it appeared "that the parties to said suit have been improperly or collusively made or joined . . . for the purpose of creating [federal jurisdiction]." Finally in 1948 Congress adopted § 1359 as part of the revision of the Judicial Code.

The reason for mandating careful examination of such transfers or assignments has been clear: such devices, unless controlled, can provide a simple means of expanding federal diversity jurisdiction far beyond the purpose of the Founding Fathers, which was simply to provide an impartial forum for out-of-state parties who might be subject to prejudice in local state courts. With this exception federal courts were intended to adjudicate federal issues. Suits between local citizens not raising federal issues were to be confined to state courts.

In *Kramer v. Caribbean Mills,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), the Supreme Court for the first time construed § 1359. Noting that the purpose of the statute, like that of its predecessors, was "to prevent the manufacture of Federal jurisdiction by the device of assignment" (quoting from the Reviser's Note to the 1948 revision), Justice Harlan, speaking for a unanimous court (except for Justice Fortas who took no part in the case) observed first that plaintiff Kramer had admitted that the assignment "was in substantial part motivated by the desire . . . to make diversity jurisdiction available." Justice Harlan concluded that the assignment fell "not only within the scope of § 1359 but within its very core" and pointed out that

> "If federal jurisdiction could be created by assignments of this kind, which are easy to arrange and involve few disadvantages for the assignor, then a vast quantity of ordinary contract and tort litigation could be channeled into the federal courts at the will of one of the parties. Such 'manufacture of Federal jurisdiction' was the very thing which Congress intended to prevent when it enacted § 1359 and its predecessors."

The liberal interpretation given to § 1359 by the Supreme Court in *Kramer* was applied by us in *O'Brien v. Avco Corp.,* 425 F.2d 1030 (2d Cir. 1969), where we held that the appointment of an administrator of an estate for the purpose of creating federal jurisdiction violated § 1359 and construed that section as barring "agreements whose primary aim was to vest the court with a

jurisdiction it had not formerly enjoyed," *id.* 1034. See also *Vaughn v. Southern Railway Co.,* 542 F.2d 641 (4th Cir. 1976). The reasoning behind our interpretation of the statute was well summarized by Judge [now Chief Judge] Kaufman in *O'Brien*:

> "The historical rationale for diversity jurisdiction was that out-of-state parties might be subjected to undue prejudice in state courts, and thus ought to be afforded the opportunity to have their cases tried in an impartial forum. See *Bank of the United States v. Deveaux,* 9 U.S. (5 Cranch) 61, 87, 3 L.Ed. 38 (1809) (Marshall, C. J.). The continued validity of Marshall's argument, in a mobile and urban society has been questioned by scholars. Several, however, still agree that the danger of prejudice—or merely the fear of it—remains the chief underlying support for diversity jurisdiction.
>
> "Even under that rationale, however, there can be no excuse for engulfing the already over-burdened federal courts with cases involving controversies between citizens of the same state, who seek to invoke federal jurisdiction through sham transactions. Section 1359 is merely the last of a series of enactments embodying that clear and salutary principle." 425 F.2d at 1033 (footnote omitted).

With the tremendous increase in interstate travel and country-wide communication over the past few decades the possibility of substantial prejudice based on a party's residence or state of incorporation has undoubtedly declined almost to the vanishing point. State lines no longer serve as a distinctive factor in gauging the possibility of such prejudice. Large corporations doing business on a nation-wide scale are rarely viewed as "outsiders" in any part of the United States. The resident of any state becomes accustomed to sharing experiences on television with residents of every part of the country. Hardly any basis appears to exist, therefore, for a claim by an in-state individual, much less by a corporation having its principal place of business in a state, that either faces prejudice in resorting to the state court of residence or place of business. Section 1359 should therefore be construed broadly to bar any improper attempt to create federal diversity jurisdiction.

The scrutiny normally applied to transfers or assignments of claims which have the effect of creating diversity must be doubled in the case of assignments between related or affiliated corporations since common ownership or the control by one of the other only serves to increase the possibility of collusion and compound the difficulty encountered in detecting the real purpose of the assignment. For this reason it was suggested by the Supreme Court almost a century ago that an intercorporate assignment between a parent and its subsidiary should be treated as presumptively ineffective for jurisdictional purposes. In *Lehigh Mining & Mfg. v. Kelly,* 160 U.S. 327, 16 S.Ct. 307, 40 L.Ed. 444 (1895), the Supreme Court dismissed for lack of jurisdiction an action in which a Virginia corporation had transferred title to lands in Virginia to a Pennsylvania subsidiary which then asserted diversity jurisdiction in the federal court in Virginia, stating:

> "It is true that the technical legal title to the lands in controversy is, for the time, in the Pennsylvania corporation. It is also true that there was no formal agreement upon the part of that corporation 'as an artificial being, invisible, intangible and existing only in the contemplation of the law,' that the title should ever be reconveyed to the Virginia corporation. *But when the inquiry involves the jurisdiction of a Federal court—the presumption in every stage of a cause [is] that it is without the jurisdiction of a court of the United States, unless the contrary appears from the record . . . .*" 160 U.S. at 336, 16 S.Ct. at 310 (emphasis added).

Thus was forged a simple, practical approach to the difficult task of distinguishing genuine from sham transfers between closely related entities.

> "[I]t is obvious that when a wholly-owned subsidiary assigns a claim to its parent, just as in the reverse situation, the same

set of stockholders running both corporate forms can transfer title to that claim freely between them. In each case the transferor, whether it is the parent or the subsidiary, realistically retains a substantial pecuniary interest in the outcome of the litigation which it assigns to the other. . . . While it is conceivable that a subsidiary could prove that an assignment was made to its parent, or vice versa, for legitimate commercial reasons independent of the desire to litigate in federal court, it must bear a heavy burden of proof since the close relationship between parent and subsidiary necessarily presents opportunities for the collusive manufacture of such reasons. *Green and White Construction Co. v. Cormat Construction Co.,* 361 F.Supp. 125, 128 (N.D. Ill.1973).

■ Having in mind the policy in favor of strict application of § 1359, we believe that the creation of a presumption represents an appropriate method of resolving claims of collusiveness based upon assignments between related corporations of the type encountered in this case. Accordingly we hold that where it is shown that a non-diverse parent corporation has assigned a claim to its wholly owned diverse subsidiary engaged in no business other than the prosecution of that claim, the assignment must be treated as presumptively improper and as having been undertaken for the purpose of attempting to manufacture diversity jurisdiction.[1] Thereupon, the assignee-plaintiff may rebut or meet the presumption by offering evidence that the transfer was made for a legitimate business purpose unconnected with the creation of diversity jurisdiction. See Federal Rules of Evidence, § 301.[2]

■ Applying this rule to the present case, the record, viewed liberally in appellee's favor, fails to provide a basis for the inference that a legitimate business reason, unconnected with acquisition of diversity jurisdiction, existed for the assignment by Prudential-Delaware to its wholly owned subsidiary, Prudential-New York, of the claim against Phillips. Although valid business reasons may have existed for other parts of the parent's corporate reorganization undertaken during the months prior to and following the assignment, including the transfer of the parent's drilling business to Prudential Drilling Funds, Inc. and of the real estate business to Prudential Land Company, none has been shown to justify the assignment of the claim against Phillips. The most that can be said is that it was assigned to the wholly owned subsidiary for prosecution by the subsidiary rather than by the parent because the parent's management desired it to be handled that way. But the prosecution by the subsidiary would be conducted wholly in the parent's interest and under the direction of the person who is the parent's chief executive.

The assignment could not reasonably have been viewed as having been made in anticipation of the resumption of a possible joint venture between Prudential-Delaware or its subsidiary and Phillips, since the record makes it clear beyond any doubt that no such possibility existed. Indeed, the district court later concluded that there had been no showing that a joint venture had ever existed. The nonexistence of any rapprochement toward a joint venture is further corroborated by the parent's exhibition of the state court complaint in May 1965 to Phillips, two months prior to the assignment, and by Shippee's testimony in December, 1965, that a July, 1963, plane crash had prevented his participation in the venture since that date. For purposes of his personal injury suit Shippee testified that

---

1. Although the American Law Institute has proposed that § 1359 be amended "to cover all cases in which the creation of federal jurisdiction was 'an object' of the assignment," see American Law Institute Study of the Division of Jurisdiction Between State and Federal Courts, 157 (1969), we need not go so far in the present case.

2. The ultimate burden of proving diversity jurisdiction always remains with the plaintiff. See *Bradbury v. Dennis,* 310 F.2d 73 (10th Cir. 1962), *cert. denied,* 372 U.S. 928, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963).

he had "lost all ability to concentrate and initiate and carry on the project," that he "was the only motivator and chief negotiator and the originator," of the project with Phillips and that "[t]he negotiations which I was controlling grounded [sic] to a halt and . . . in my absence turned in other directions and completed it without me." Moreover, by the time of the assignment, Phillips had already received the oil import quota, had obtained financing for the project, and was already engaged in the construction of the petrochemical facility in Puerto Rico. It is beyond belief that Prudential-Delaware or its subsidiary could reasonably hope to be included in the project thereafter.

Thus Prudential-New York's sole asset at the time of the assignment was the Phillips claim, which was acquired from its 100 percent owner at a time when the only alternatives available to it were to press the claim or do nothing.[3] Moreover, Prudential-Delaware stood to gain if it succeeded through the assignment in invoking federal diversity jurisdiction. In federal court it might (and did) obtain a jury trial in which it could fully dramatize Phillips' verbatim copying of some inconsequential portions of a Prudential oil import quota proposal, while in New York State court this opportunity was foreclosed.[4]

We conclude, therefore, that the evidence relied on by Prudential-New York fails completely to rebut the presumption of collusiveness or to show valid business reasons unconnected with creation of diversity jurisdiction for its incorporation in New York and the assignment to it of the claim in this suit. The possible validity of a number of other Prudential reorganizational steps during this period does not satisfy § 1359, which, we hold, requires that the transfer under scrutiny be valid on its own. No valid non-jurisdictional reason has been

shown for spinning off the claim to the New York subsidiary. That the Delaware parent or one of its other subsidiaries may have offices and personnel in New York does not provide a valid business reason for incorporating the plaintiff here in New York and assigning the claim to it, in the absence of some showing that this step was intended to provide some business advantage or reason other than diversity (e. g., a saving in taxes or operational costs; eligibility for state licenses or other benefits).

Accordingly, we reverse the judgment of the district court and direct that the complaint be dismissed. In view of this disposition we need not reach appellant's other claims of error.

---

3. See *Greater Development Company of Connecticut v. Amelung,* 471 F.2d 338 (1st Cir. 1973) (cause of action dismissed where the only asset of the surviving corporation was the claim asserted in the suit, and where the predecessor corporation would have been non-diverse).

4. See *Cogswell v. New York, New Haven & Hartford Railroad,* 105 N.Y. 319, 11 N.E. 518 (1887) (joinder of legal and equitable claims waives jury trial as a matter of right).