**PASQUOTANK ACTION COUNCIL, INC., Plaintiff,**

v.

**CITY OF VIRGINIA BEACH, Defendant.**

**Civ. A. No. 2:95cv161.**

United States District Court, E.D. Virginia, Norfolk Division.

Dec. 14, 1995.

James Arthur Winstead, Melvin, Gourdine & Winstead, Chesapeake, VA, Harold Barnes, Barnes & Associates, Norfolk, VA, for plaintiff.

Gary Leigh Fentress, City Attorney's Office, Virginia Beach, VA, Lawrence Steven Emmert, Office of the City Attorney, Virginia Beach, VA, for defendant.

## OPINION AND ORDER

DOUMAR, District Judge.

Pasquotank Action Council is a charity located in Elizabeth City, North Carolina. In 1994, it received a donation from Edwin B. Lindsley, Jr.: a small parcel of land in Virginia Beach, Virginia. For Pasquotank, the gift was apparently a mixed blessing: on the 2100 foot parcel sits a sewage pump station, which the City of Virginia Beach has owned and operated for nearly 25 years. Pasquotank now claims it is the rightful owner, and seeks to eject the City, or, alternatively, to receive compensation.

Presently before the Court in this diversity action are several issues. For the reasons set forth below, the Court FINDS that plaintiff's claim under the federal Just Compensation Clause is not ripe for adjudication and will dismiss this part of the suit without prejudice. The Court also FINDS that jurisdiction is lacking with regard to the state law claims and will DISMISS those claims without prejudice.

### I. Factual and Procedural Background

Plaintiff Pasquotank Action Council, Inc. ("Pasquotank") brings this action against the City of Virginia Beach, Virginia (the "City"), a municipal corporation under the laws of the Commonwealth of Virginia, charging that the City unlawfully occupies land purportedly owned by the plaintiff, upon which the City placed a sewage pump station in the early 1970s.

Pasquotank is a non-stock, non-profit corporation located in Elizabeth City, North Carolina. Its charitable activities include,

*inter alia,* donating food to the needy. Pasquotank has apparently been relatively inactive for much of this decade, the result of a loss of federal grant assistance in the late 1980s. Transcript of Proceedings of Oct. 31, 1995 (hereafter "Tr.") at 16, 90–91.

The testimony and stipulations reveal the following: in late August, 1950, a corporation operating under the name "Oceana Village, Inc.," recorded a subdivision plat in the Circuit Court of Princess Anne County regarding a parcel of land in what was then Princess Anne County, and is now the City of Virginia Beach. Accompanying the recordation of the plat was a "Declaration" by the corporation which set forth certain covenants and restrictions. Paragraph 11 of the Declaration stated that:

> [t]he area at the southeast corner of the subdivision, designated on the recorded Plat as "Park" is hereby expressly reserved and dedicated to public use as a Park.

Pl.Ex. 10. The recorded plat clearly shows a large section in the southeast corner which is designated as "park." Subsequent to the recordation of the plat, the deeds to each of the 155 numbered lots were sold and contained specific reference to the recorded plat and to the Declaration. *See* Tr. at 165; Def. Br. on Summary Judgment, Aug. 3, 1995 (attachments).

The property in dispute here is a small portion of the park site, consisting of roughly 2100 square feet. Tr. at 172. The remainder of the park site, which remains an undeveloped open space, consists of at least 70,000 square feet.[1] It is undisputed that Pasquotank is not now, and has never been, in possession of the property at issue. Nor do the parties dispute that the City currently possesses the property, and has for over 25 years. In 1969, the City commenced construction of a sewer pump station on the site. Construction was completed the following year, and sewer service to Oceana Village residents began in July, 1971. The pump station, which also serves other properties

---

1. This estimate is a conservative calculation, undertaken by the court, based on the dimensions contained in the recorded plat.

outside of Oceana Village, has operated continually since that time. The site is enclosed by a fence, and "No trespassing" signs have been placed on or near the fence. Virginia Beach tax records regarding the parcel, which date back to 1976, show that at all times since then, the parcel has been carried on the City's tax rolls as a "tax-exempt" property owned by the City. Aff. of Jerald D. Banagan, Aug. 3, 1995, ¶ 2.

In the early 1990s, Mr. Edwin B. Lindsley, Jr., a person involved in the real estate business,[2] approached Mr. Frederick Stant, a trustee of Oceana Village (by then dissolved) about purchasing whatever interest the corporation owned in the park site. Mr. Lindsley's entreaty apparently failed. Tr. at 111. James E. Moore, Jr., a frequent business partner of Lindsley with whom he shares an office, then approached Stant about purchasing the land. Moore stated that he went to Stant because Stant would not sell to Lindsley. *Id.* at 48. Meanwhile, Stant received an unsolicited letter from an attorney, Mr. Jerry Douglas, rendering a legal opinion that the City did not own the park site and that Oceana Village retained an interest in it. *Id.* at 98. Lindsley had employed Douglas to send the letter to Stant. *Id.* at 114. Stant, a retired attorney, stated that he did not know if Oceana Village had an interest in the park site. *Id.* at 99.

In May, 1993, Moore received an option to purchase the land. Def.Ex. 4–B. On December 14, 1993, Mr. Stant, the trustee of Oceana Village, conveyed the property, without warranty, to Mr. Moore's corporation, the Ivan Corporation. *See* Pl.Ex. 3. Mr. Stant, uncertain about whether Oceana Village had an interest or obligation in regard to the "park" site, demanded and received an indemnity agreement from Moore and Lindsley shielding himself from liability in the event of any subsequent litigation by any party. Tr. at 99. Moore testified that he paid $14,000 for the property, using what he characterized as a "loan" from Lindsley. *Id.* at 47. A week later, the Ivan Corporation transferred the property to Lindsley. Although the deed of sale states that Lindsley paid the sum of $10.00 cash and other "good and valuable considerations," both Moore and Lindsley testified that no money was paid for the transfer. *Id.* at 48, 117. Mr. Lindsley, quite understandably, considered that he had already paid for the property in "loaning" the $14,000 to Mr. Moore. *Id.* at 117.

Negotiations between an agent hired by Lindsley, Mr. Severn Kellam (a title examiner), and the City ensued. *Id.* at 159–60.[3] Lindsley sought to convince the City, through Mr. Kellam, to relinquish its interest in the park site, and to obtain permission to subdivide the property in order to develop six residential building sites. *Id.* at 160; Pl.Ex. 9 (plat prepared by surveyor). The negotiations proved unsuccessful, and the matter was dropped. Tr. at 161.

After the negotiations with the City failed, Mr. Lindsley decided to "donate" that portion of the property occupied by the City and its sewage pump station. He asked an attorney whom he had previously retained on other matters, Harold Barnes, to recommend a worthy charity. Barnes, who also represents the plaintiff in the instant case, suggested Pasquotank, a North Carolina charity with which he was familiar. Barnes, who practices in this area of Virginia, is a member of a firm which has an office in Elizabeth City, North Carolina. On July 5, 1994, Lindsley made his donation. He did not donate the entire park, but only a minuscule

**2.** It is worth pausing here to elaborate on the real estate business conducted by Mr. Lindsley. Much of his business involves what he termed "assembling" real estate. Such "assembling" is carried out by purchasing property with defects in the chain of title, and then trying to free the property from existing encumbrances in order to make it marketable. The property is then developed or sold at a profit. Tr. at 103–05. Mr. Lindsley has been assembling property in this manner for several decades in the Hampton Roads area. *See* Tr. at 109; *see also Lindsley v. Commissioner,* 47 T.C.M. (CCH) 540, 1983 WL 14716 (1983). According to his testimony, he brings suits in the Virginia state courts "maybe two or three times a year" regarding property in which he claims an interest. Tr. at 105–06.

**3.** Moore testified that he had negotiated with the City prior to conveying the land to Lindsley. Whether these negotiations occurred in the one week time span in which Moore actually owned the property, or while Moore merely held an option to the property, is not clear from the record.

fragment—the 2100 square foot parcel on which the sewage pump station sits. Lindsley retained the remainder of the park site, that is, the area where he hopes to develop the six residential lots.

Pasquotank's action contains three counts, all of which make the same essential charge: that Pasquotank is the rightful owner of the parcel and that the City is in unlawful possession of the sewage pump station site. Pasquotank brings an ejectment action (Count I) and an assumpsit for use and occupation action (Count III) under Virginia law. Count II charges the City with violating the Fifth Amendment to the U.S. Constitution and Article 1, Section 11 of the Virginia Constitution, both of which bar the taking of private property for public use without just compensation. Pasquotank seeks damages and injunctive relief.

On August 3, 1995, the City moved for summary judgment. During the final pretrial conference, and while the summary judgment motion was still pending, the City raised the question of whether subject matter jurisdiction was proper; that question may, of course, may be raised at any time. Fed.R.Civ.P. 12(h)(3). The Court conducted an evidentiary hearing on the jurisdictional issue on October 31, 1995.

## II. Ripeness of Federal Just Compensation Clause Claim

■ The first issue that must be addressed is whether the claim set forth in Count II, the alleged violation of the federal Just Compensation Clause, is ripe for adjudication. It is not. When a state provides an "adequate procedure" for obtaining just compensation, a property owner cannot claim a violation of the federal provision "until it has used the [state] procedure and been denied just compensation." *Williamson County Regional Planning Comm. v. Hamilton Bank,* 473 U.S. 172, 196, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985). Virginia provides two means, a self-executing provision in the state constitution, Va. Const. of 1970, art. I, § 11, *Burns v. Fairfax County Bd.* 218 Va. 625, 238 S.E.2d 823, 825 (1977) (citing *Heldt v. Tunnel Dist.,* 196 Va. 477, 482, 84 S.E.2d 511,

515 (1954)) (landowner may enforce right in common law action), and a statutory mechanism. Va.Code Ann. §§ 8.01–184 and 8.01–187. The constitutional remedy and the statutory remedy are not mutually exclusive; either may be used by an aggrieved landowner. *Chaffinch v. Chesapeake & Potomac Tel. Co.,* 227 Va. 68, 313 S.E.2d 376, 378 (1984).

Pasquotank concedes that it has not availed itself of the available Virginia remedies. Tr. at 8–10. Therefore, the federal claim is not ripe. Plaintiff has not suffered any cognizable injury that could be remedied by this Court. Accordingly, the claim under Count II for violation of the federal Just Compensation Clause is DISMISSED without prejudice.

## III. Necessary Parties

Although neither party raised the issue, the Court, *sua sponte,* noted that it appeared that all the parties with an interest in the case are not before the Court and should be joined.

■ The issue of joinder in a diversity action, as this is, is governed by federal law. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 125 n. 22, 88 S.Ct. 733, 746 n. 22, 19 L.Ed.2d 936 (1968); *Travelers Ins. Co. v. Riggs,* 671 F.2d 810, 813 (4th Cir.1982). A court, however, "must look to the state-law relationships between the parties when determining which parties ... are necessary for a just adjudication of the case." *Delta Financial Corp. v. Paul D. Comanduras & Assoc.,* 973 F.2d 301, 305 (4th Cir. 1992). The question of joinder is a "practical one that is addressed to the sound discretion of the trial court." *Bates v. Cekada,* 130 F.R.D. 52, 57 (E.D.Va.1990) (citing *Coastal Modular Corp. v. Laminators, Inc.,* 635 F.2d 1102, 1108 (4th Cir.1980)) (internal quotation omitted).

Federal Rule of Civil Procedure 19 requires that parties with an interest in a proceeding shall be joined unless joinder will deprive the court of subject matter jurisdiction. Specifically, the rule states in pertinent part that:

**(a) Persons to be Joined if Feasible.** A person who is subject to service of process

and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff.

Fed.R.Civ.P. 19(a). The question here focuses on whether persons "claiming an interest" relating to the subject of this action would be prejudiced unless joined. Fed.R.Civ.P. 19(a)(2)(i).

■ Count Three of the Pasquotank's action is a claim for assumpsit for use and occupation; Pasquotank claims that the City has been unjustly enriched in the amount of $1,718,280. An action for assumpsit based on a quasi-contract is equitable in nature. *Grice v. Todd,* 120 Va. 481, 91 S.E. 609, 611 (1917). Therefore, any party having an equitable interest in the parcel has an interest in this litigation, namely, a claim on any money awarded if the City loses. Each lot owner in Oceana Village has such an interest.

When Oceana Village, Inc., recorded the subdivision plat in 1950, the designation on the plat of the park site created an equitable interest held by each individual lot owner in the subdivision. Regardless of whatever interest the City attained by virtue of the "dedication" made by the declaration, *see* Pl.Ex. 10, the common scheme or plan embodied in the plat, historically, acted to create an equitable servitude, also known as an implied reciprocal negative easement, in the park site. By so designating this area, Oceana Village was vested with a responsibility to maintain the area as a park. The property owners, every one of them, consequently gained an equitable servitude: the right to use and enjoyment of the park property— and the right to enforce the interest in equity.

■■ This doctrine is hardly new: it is rooted in English common law, *Tulk v. Moxhay,* 2 Phillips 774, 41 Eng.Rep. 1143 (Ch. 1848), and has been embraced in Virginia since at least the early decades of this century. *Cheatham v. Taylor,* 148 Va. 26, 138 S.E. 545 (1927). *See generally,* Note, *Equitable Restrictions in Land and Tulk v. Moxhay in Virginia,* 39 Va.L.Rev. 703 (1953) (hereafter *Equitable Servitudes* ). In *Cheatham,* the development firm passed a resolution mandating a set-back from the street of 20 feet and ran a newspaper advertisement noting that no house in the development could be constructed for less than a certain value. Each of the deeds contained similar restrictions. Within two years, the development firm was insolvent, and conveyed its interests without mentioning the restrictions. 138 S.E. at 547. The Virginia Supreme Court held that

> when the common grantor made the earlier conveyances, there was an implied promise on its part, especially in view of the resolution of its board of directors and advertisement, that the entire property covered by the resolution should be subject to the restriction, and for a violation of this promise it could have been enjoined by a purchaser of one of the lots. *An equity attached to the lots sold which the common grantor could neither violate nor alienate to a purchaser with notice* (emphasis added).

*Id.* 138 S.E. at 551. *See also Deitrick v. Leadbetter,* 175 Va. 170, 8 S.E.2d 276, 278 (1940); *Renn v. Whitehurst,* 181 Va. 360, 25 S.E.2d 276, 278–79 (1943). More recent cases reaffirming the rule are *Minner v. Lynchburg,* 204 Va. 180, 129 S.E.2d 673, 678 (1963) and *Mid–State Equipment Co. v. Bell,* 217 Va. 133, 225 S.E.2d 877, 884 (1976). In determining whether an equitable servitude exists, the intent of the grantor is an "essential factor." *Minner,* 129 S.E.2d at 678. Determining such intent involves examination of

the words used in the restriction, the plats, the deeds, the surrounding circumstances, and the use of the property. *Mid–State Equipment*, 225 S.E.2d at 884. The equity is enforced against parties with notice, actual or constructive. *Id.* If an equity attached to the lands in the case at bar, then the common grantor, Ocean Village, Inc., could neither violate nor alienate this equity.

Here, the intent of the grantor is clear. In August, 1950, Oceana Village, Inc., recorded a plat, upon which is shown a site in the southeast corner designated as a "park." The declaration submitted and recorded simultaneously with the plat states that the area marked as a "park" on the plat is "hereby expressly reserved and dedicated to public use as a Park." Pl.Ex. 10. The City submitted, for illustrative purposes, copies of three deeds to lot purchasers in the 1950s. Each of these deeds contains a reference to the recorded plat, and states that the conveyance was being made "expressly subject to the conditions, restrictions, and easements, if any, of record, constituting constructive notice." *See* Def.Br. on Summary Judgment, Aug. 3, 1995 (attachments). Mr. Kellam's research confirmed that this standard language was used in the deeds to all 155 lots. Tr. at 165.

Taken together, the plat, the declaration, and the references to the plat in the deeds of sale created an equitable servitude held by the individual lot purchasers in the lot marked "Park." The open space of a "park" promised in the plat, quite obviously, added value to the lots—a value which, inexplicably, Pasquotank dismisses summarily. *See* Plaintiff's Mem. in Response to Court's Inquiry at 5. The fact that the parcel was apparently never developed into a park would not negate the equitable right. "Failure to object to previous violations of the same covenant does not preclude a property owner from seeking equitable relief." *Equitable Servitudes, supra,* at 715 (citing *Deitrick*, 8 S.E.2d at 279).

Any subsequent holder of the property with notice, actual or constructive, would be bound by the restriction. The references in the deeds of sale or gift to the original recorded plat of Oceana Village constitute sufficient notice. *See, e.g.,* Pl.Ex. 5 (deed of gift from Mr. Lindsley to Pasquotank).

Thus, each and every lot owner would have an equitable right to bring suit against the development corporation (Oceana Village) and its successors and assigns to require them to comply with their covenants. This equitable right was at the very heart of the reason why Mr. Stant, the receiver, insisted that Lindsley and Moore execute indemnity agreements. Moreover, the equitable interest of the 155 lot owners in the continued operation of the sewage pump station, and the continued disposal of their sewage, is an important interest which, if disturbed, would create a big stink (pun intended). Clearly, such lot owners would be prejudiced.

## IV. Jurisdiction

The City contends that the Court does not have jurisdiction over the remaining state law claims, alleging that the transfer from Lindsley to Pasquotank was made solely for the purpose of creating diversity under 28 U.S.C. § 1332. Federal district courts do not have jurisdiction over civil actions "in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359 ("§ 1359"). The purpose of this provision is self-evident: to prevent the "vast quantity of ordinary contract and tort litigation" from being funneled into federal courts. *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 829, 89 S.Ct. 1487, 1490, 23 L.Ed.2d 9 (1969). Courts "carefully scrutinize" transfers or assignments which might have the effect of creating diversity. *Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469, 474 (2d Cir.1976). The party asserting jurisdiction bears the burden of proving it exists once jurisdiction is challenged. *McNutt v. General Motors Accept. Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Harvey Const. Co. v. Robertson–Ceco Corp.*, 10 F.3d 300, 303 (5th Cir.1994).

The Supreme Court has given a liberal construction to section 1359. In *Kramer, supra,* the plaintiff had been assigned an interest in a contract for the stated consideration of $1.00. The plaintiff also pledged to

pay back to the assignor 95 percent of any net recovery on the assigned cause of action. The plaintiff conceded that the assignment was in "substantial part" motivated by a desire to create diversity jurisdiction. 394 U.S. at 828, 89 S.Ct. at 1490. The Court concluded that this amounted to an "improper or collusive" assignment, stating that "such manufacture of Federal jurisdiction was the very thing Congress intended to prevent when it enacted § 1359 and its predecessors." *Id.* at 829, 89 S.Ct. at 1490 (internal quotations omitted). The Court left undisturbed, however, other Court cases upholding jurisdiction where "the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter." *Id.* at 827 n. 9, 89 S.Ct. at 1490 n. 9.

Most of the lower court cases regarding § 1359 since *Kramer* have involved either transfer or assignment of interests from a corporation to a subsidiary, *e.g., Prudential Oil, supra,* 546 F.2d 469 (2d Cir.1976), or the question of whether appointment of an out-of-state administrator in an estate case destroys diversity. The only decisions in the Fourth Circuit since *Kramer* involve the latter issue. *See, e.g., Krier–Hawthorne v. Beam,* 728 F.2d 658, 662 & n. 1 (4th Cir.1984) (collecting cases) (Murnaghan, J., dissenting).[4] The estate cases are conceptually distinct from the case at bar, however, insofar as the Fourth Circuit's analysis has centered largely on the "real party in interest," in contrast to this case, where the focus is on the circumstances surrounding the transfer or assignment of interests. *See Kramer,* 394 U.S. at 828 n. 9, 89 S.Ct. at 1490 n. 9 (noting that estate cases vary from assignment cases in several respects).

■ This Court has not discovered any authority directly addressing the factual situation here, namely, the conveyance of an interest to a non-profit entity. Nonetheless, the factors involved in assessing assignment of business interests by corporations to their subsidiaries extend logically to the instant case; to hold otherwise would be to invite corporations to make sham assignments to affiliated or friendly non-profit corporations,

rather than subsidiaries, to create diversity. It bears emphasis here that section 1359 is not limited to assignments: it bars jurisdiction where any party, by assignment *or otherwise,* has been improperly or collusively made or joined.

■ Determining whether diversity exists is a "practical" determination rather than a mechanical one. *Smith v. Sperling,* 354 U.S. 91, 97, 77 S.Ct. 1112, 1116, 1 L.Ed.2d 1205 (1957). *Kramer* and its progeny in the lower courts suggest that several factors are relevant in judging whether a party has been collusively or improperly made. Most prominent are the two factors set forth in *Kramer,* that is, whether (1) there was nominal or no consideration involved in the transaction; and (2) the interest in the action retained by assignor. *E.g., Westinghouse Credit Corp. v. Shelton,* 645 F.2d 869, 871 (10th Cir.1981) (valid assignment where substantial consideration and assignor retained no interest in transaction). Motivation is also a factor, *see, e.g., Harrell & Sumner Contracting v. Peabody Petersen Co.,* 546 F.2d 1227, 1229 (5th Cir.1977) (assignment "collusively" made where party who would destroy diversity assigned one-half interest in the litigation to plaintiff and action taken for tactical reasons to create diversity), although utilizing motive is not a universally accepted rule. *See* 14 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure: Civil 2d* § 3639, at 114–16 (2d ed. 1985) (noting that question of motive remains "somewhat undecided").

This Court believes that motivation is highly relevant. The statute seems to dictate such an inquiry. Section 1359 proscribes the "improper" or "collusive" making or joining of a party where it is done "to invoke the jurisdiction of [the] court." Judging whether an act is "improper," or was taken for the particular purpose of getting into federal court, involves, necessarily, subjective judgments about the motivations of those taking the act. *See Design for Bus. Interiors v. Herson's Inc.,* 659 F.Supp. 1103, 1109 (D.D.C.1986) (subjective intent of plain-

---

4. In those cases, the Fourth Circuit has adopted a commonsense rule that focuses on the citizen-ship of the beneficiary, rather than the administrator of the estate. *Id.* at 660.

tiff critical to section 1359 determination); *Steele v. Hartford Fire Ins. Co.*, 788 F.2d 441, 444 (7th Cir.1986) (dictum) (motive should be examined unless assignment probably would have been made absent motive); *cf. Kramer, supra*, 394 U.S. at 828, 89 S.Ct. at 1490 (assignment still improper even if in compliance with state law).

With these principles in mind, the Court now turns to the facts of this case. It is undisputed that the conveyance from Lindsley to Pasquotank was without consideration; it was a gift. Pl.Ex. 5. Although Lindsley denies retaining any direct interest in the case, and denies paying his attorney, Mr. Barnes, to represent the plaintiff, Lindsley retains a strong collateral interest in the case. Significantly, he donated to Pasquotank not the whole parcel, but a very small section of it—the section upon which the City has its pump station, leaving his six proposed building sites unaffected. Should Pasquotank succeed in ejecting the City from the site it claims, Lindsley can then claim that his title to the adjacent site has been collaterally established; he would then, potentially, be free to develop his subdivision, which he has already platted. Pl.Ex. 9. Lindsley also hopes to take a tax deduction for his donation. Tr. at 128. Presumably, although this question is not for this Court, either he or Pasquotank will have to demonstrate clear title to the land for him to take the deduction. In short, Lindsley stands to gain considerably if Pasquotank prevails.

Two letters before the Court provide additional indicia of Lindsley's interest in the case, and of collusion between Lindsley and Barnes. These letters, dated June 30, 1995 and July 14, 1995—a full 12 months after Lindsley deeded the property to Pasquotank—are written by Barnes to the City attorney. *See* Def. Ex. 2. The letters discuss arrangements for deposing City officials in this case. They contain a notation at the bottom left-hand side. The notation is commonly used in business correspondence to identify the author and the typist. Below the initials which identify the author ("HB", or Harold Barnes) and the typist (whose initials are "CE") is an additional notation which evidently denotes the computer file in which

the documents are filed. They carry the designation "cat/lindsleyp11" and "cat/lindsleyp15," respectively. This would indicate that Barnes' typist believed the work in this case was actually being undertaken on behalf of Mr. Lindsley, not Pasquotank.

■ Finally, there is an unsigned and undated memorandum discovered in the files of the title examiner Kellam, who had undertaken to represent Mr. Lindsley in Lindsley's negotiations with the City. Addressed to Kellam (the author is not identified), the memo briefly reviews that the negotiations with the City were making no progress. It then states as follows:

4. After 2 years .... of fooling around with the City, we [are] request[ing] a positive answer [from the City] ... on or before July 15, 1994.

5. After this date we will then convey the pump station to Mr. Barnes people [sic] who will then take the City into Federal Court (Title will be conveyed to a North Carolina non-stock corporation).

During the evidentiary hearing, the Court ruled that the memorandum was inadmissible on grounds that it was not authenticated. Upon further reflection, and review of the pertinent law, the Court believes its in-court ruling was in error, and will consider and admit the document as evidence for the purpose of determining jurisdiction.

Federal Rule of Evidence 901(a) states that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "The burden of proof for authentication is slight." *Link v. Mercedes–Benz of N. Amer., Inc.*, 788 F.2d 918, 927 (3d Cir.1986). Rule 901(b) provides several illustrative examples of how demonstrative evidence may be authenticated; two are pertinent here. A document may be authenticated by "[c]omparison by the trier of fact ... with specimens which have been authenticated." Alternatively, authentication may be satisfied based on the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed.R.Evid. 901(b)(3), 901(b)(4). The Court

notes that the typeface of the memorandum in question is strikingly similar to the typeface on two letters written by Mr. Moore in the office shared by Moore and Lindsley (they also share a secretary). *See* Def. Ex. 4–A & 4–B. Moreover, the memorandum was in the file of Mr. Kellam—that is, in the specific file concerning this parcel—who was representing Mr. Lindsley in his negotiations with the City. Possession of the document by Mr. Kellam, even though he testified that he is ignorant of its origin, bolsters the Court's determination of authenticity. The presence of the memorandum in the files of an agent of Lindsley and Moore is not a coincidence. It could have only been written by one of the handful of people with knowledge of the negotiations with the City concerning the property at issue. Finally, Mr. Kellam testified that he did not see "*a single thing in [the memo] . . . that I don't feel is true.*" Tr. at 162 (emphasis added). In other words, a person with first-hand knowledge of the negotiations undertaken on Lindsley's behalf with the City confirmed the substance of the memorandum. All this provides strong circumstantial evidence that the document is authentic. A court may, of course, rely on such evidence for authentication purposes. *See United States v. Drougas,* 748 F.2d 8, 26 (1st Cir.1984) (string of coincidences may provide authentication where extremely unlikely that item prepared by someone not privy to conspiracy); *United States v. Bello–Perez,* 977 F.2d 664, 671 (1st Cir. 1992) (anonymous correspondence may be sufficiently distinctive in its "appearance, contents, [and] substance. . . ." such that it may be authenticated); *see also* John W. Strong, *McCormick on Evidence* § 222 (4th ed. 1992) ("proof of circumstances which will support a finding that the writing is genuine will suffice to authenticate [it]").

The facts in this case, to use Judge Posner's apt phrase, "emit an odor of collusion." *Herzog Contracting Corp. v. McGowen Corp.,* 976 F.2d 1062, 1067 (7th Cir.1992). Indeed, the odor is so strong that it is conclusive. Mr. Lindsley had an obvious motive to transfer the parcel in question to Pasquotank. Unable, after considerable effort, to convince the City to relinquish its interest, he needed a straw man who could establish that the City lacked proper title to the land—which, if proved, would collaterally benefit him. Lindsley does not need the sort of overt agreement present in *Kramer, supra,* binding Pasquotank to remit its interest to him if the litigation succeeds, because his continued ownership of the remainder of the park site ensures that he will, in all likelihood, benefit greatly if Pasquotank prevails. The memorandum, the substance of which was confirmed by Mr. Kellam, provides direct evidence of the improper act to create jurisdiction.

Other factors bolster the Court's conclusion. After testifying during the jurisdictional hearing (having been subpoenaed by the City), both Lindsley and Moore remained in the courtroom, passing notes and whispering to attorney Barnes. It was obvious to the Court that they retain a substantial interest in the proceedings; why else would two businessmen—who both claimed to have so many business projects underway that they could not recall several pertinent facts in this case—waste their time by remaining in the courtroom? And what advice were they giving to attorney Barnes? Of course, this evidence is not in the record. But are judges expected to ignore facts, though not in evidence, that are plainly obvious? The Court cannot, and will not, disregard events that occur in the courtroom, even if those events are not reflected in the transcript. It clearly appeared that Mr. Lindsley was the person who was consulting and directing Barnes throughout the evidentiary hearing.

Testimony of Lindsley and his agents strained credulity. For example, Mr. Moore claimed that the money he used to purchase the land from Oceana Village was a "loan" from Lindsley. This occurred after Lindsley unsuccessfully sought to purchase the land from Mr. Stant, the trustee of Oceana Village. Within a week, Moore conveyed the land to Lindsley for no consideration. It defies reason to accept Moore's characterization that the money was a loan; stated plainly, Moore was a front man for Lindsley. Both Moore and Lindsley failed to recall several pertinent facts; their memories appeared to be deliberately selective. Frankly, their demeanor and actions in court belie

their testimony. The Court can only accept portions of their testimony and rejects most of it.

In sum, the Court finds that the situation here is not far afield from the facts in *Kramer*. Mr. Lindsley transferred the land without consideration, and retained a substantial, though indirect, interest in the outcome of the litigation brought by the transferee. Thus, although the transfer of the interest was "absolute", it cannot be said that the transferor "retained no interest in the subject matter." *Kramer*, 394 U.S. at 827 n. 9, 89 S.Ct. at 1490 n. 9. Although the parties here did not concede that they were motivated by a desire to get into federal court, as the plaintiff did in *Kramer*, such motivation was confirmed by the memorandum describing the plan to take the City into federal court. Even without that document, Lindsley's motive is laid bare by his transfer of the tiny, and largely useless (for development purposes) pump station site, and his retention of the most valuable portion of the park property; he stood to benefit greatly if Pasquotank succeeded here. Frankly, the only thing given to Pasquotank was litigation, which, if it were paying the fees without reimbursement, might well cause its demise.

As the Court stated in *Kramer*, transactions of this nature are "easy to arrange and involve few disadvantages for the assignor." *Id.* at 828, 89 S.Ct. at 1490. Such "manufacture" of diversity jurisdiction was precisely why Congress enacted 28 U.S.C. § 1359. *Id.* The Court therefore **FINDS** that the plaintiff was made a party improperly within the meaning of § 1359. Accordingly, the Court lacks subject matter jurisdiction over the state law claims: the ejectment action (Count I), the assumpsit for use and occupation action (Count III), and the state law claim under Count II of a "taking" without just compensation in violation of Article I, Section 11 of the Virginia Constitution. These claims are therefore **DISMISSED** without prejudice.

### V. Conclusion

Federal courts are empowered to hear certain cases between citizens of different states, a statutory right that has existed since the Judiciary Act of 1789. But they are not available to parties who collude in order to improperly manufacture diversity, as occurred here.

All of the state law claims are **DISMISSED** without prejudice. The claim under the federal Just Compensation Claim is not ripe, and is also **DISMISSED** without prejudice. Should, however, such claims ever become ripe, or should this case ever be reinstated, then the 155 lot owners must be joined as parties.

The Clerk of the Court is **DIRECTED** to forward copies of this order to counsel for the parties.

**IT IS SO ORDERED.**