LONG & FOSTER REAL ESTATE, INC., Plaintiff,

v.

NRT MID–ATLANTIC, INC., Defendant.

No. CIV.A. 1:04CV1323.

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 11, 2005.

Brien Anthony Roche, Johnson & Roche, McLean, VA, for Plaintiff.

Robert C. Gill, Slavit & Gill, Washington, DC, for Defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

A threshold motion to dismiss filed by the defendant in this breach of contract action presents the following questions:

(i) whether assignments executed in favor of the plaintiff real estate broker by 58 of its individual real estate agents, of contract claims for commissions that the agents have against the defendant real estate broker, are valid under the Virginia Code and the Virginia Real Estate Regulations;

(ii) whether the plaintiff can assert and aggregate all of its assigned claims against the defendant in a single ac-

tion in this forum under the Federal Rules of Civil Procedure; and

(iii) whether the assignments by the individual real estate agents ·to the plaintiff were "improperly or collusively made" to obtain federal jurisdiction, in violation of 28 U.S.C. § 1359.

Because the answers to these questions, respectively, are (i) yes, (ii) yes, and (iii) no, defendant's motion to dismiss must be denied.

## I.[1]

Plaintiff, Long & Foster Real Estate, Inc. (Long & Foster), and defendant, NRT Mid–Atlantic, Inc. (NRT), are both real estate brokerage firms operating in the Northeast United States. Specifically, Long & Foster is a licensed Virginia corporation with offices in Fairfax, Virginia, while NRT, trading as Coldwell Banker Residential Brokerage, Inc., is a Maryland corporation with its principal place of business in New Jersey. NRT is also the owner and operator of a third real estate brokerage firm—Pardoe & Graham, Pardoe Realty and/or Pardoe ERA (Pardoe)— which, like Long & Foster, is licensed to perform real estate services in Virginia.

As is customary in the real estate industry, brokerage firms typically enter into written, and sometimes oral, independent contractor agreements with individual real estate agents. These individual agents then perform real estate services on behalf of the brokerage firm in return for a portion of the commissions earned in connec-

tion with real estate sales. In this regard, brokerage firms typically receive a 4 to 6 percent commission on each completed real estate transaction, while the participating individual real estate agent then receives a portion of this commission in accordance with his or her independent contractor agreement with the brokerage firm. And, the amount paid by the brokerage firm to a particular agent for a particular transaction often varies depending on the agent's experience or other factors.

The record reflects that in 2002, Pardoe was a party to such oral and written independent contractor agreements with various individual real estate agents. At some point in 2002 or 2003, 58 of these individual real estate agents became dissatisfied with Pardoe and made the collective decision to seek alternative employment. At the time they terminated their employment relationships with Pardoe, these 58 individual agents were allegedly entitled to certain sums from Pardoe in connection with the sale of 150 residential homes. Each of these sales appears to have arisen from a different contract of sale, ·entered into by different sellers, with different buyers, for different sales prices, with different conditions, and with closings on different dates.[2]

It is undisputed that Pardoe paid the 58 individual agents a portion of the commissions to which they were entitled with respect to these 150 real estate transactions. Yet, additional amounts allegedly owed to the agents for these transactions under their respective independent con-

---

1. The facts recited here are derived from the allegations of the complaint and, when necessary to resolve threshold jurisdictional issues, from the record as a whole. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir.1995) (recognizing that courts may consider evidence outside of the complaint when resolving questions of subject matter jurisdiction).

2. It is unclear from the record whether all of the 150 real estate transactions in issue had closed by the time the individual agents had left Pardoe's employment. In this regard, while Exhibit 1 to the complaint makes clear that all of the 150 disputed real estate contracts were entered into in either 2000, 2001 or 2002, approximately ten of the actual settlement dates appear to have extended into 2003 or 2004.

tractor agreements were withheld by Pardoe. It is these additional amounts that are the subject of the assignments in issue here. And, although it is not entirely clear from the current record, these disputed amounts, totaling $423,484.09, appear to fall into three general categories, namely (i) an alleged 6 percent deduction applied by Pardoe to the total broker's commission that it received in connection with each transaction, prior to calculating the participating agent's share of that commission, (ii) an additional 25 percent deduction applied by Pardoe to the participating agent's calculated share of the total broker's commission in each transaction, presumably as a result of the departure of the 58 individual agents from Pardoe's employment, and (iii) miscellaneous costs claimed by the participating agents.

After terminating their relationships with Pardoe, the 58 individual real estate agents became associated with Long & Foster. This employment transition was a negotiated arrangement between Long & Foster and all 58 agents as a group, rather than with each agent individually. And, in the course of this negotiation process, the agents apparently requested that Long & Foster reimburse them the precise amounts they believed they were still due from Pardoe in connection with the 150 disputed real estate transactions. Long & Foster complied with the agents' request in this regard, in part to induce the agents to join Long & Foster. Thus, on some unknown date in 2002 or 2003, Long & Foster reimbursed the 58 agents the exact amount—one hundred cents on the dollar—that each agent believed he or she was due from Pardoe. In return for the reimbursements, the agents agreed to assign their respective contract claims against Pardoe to Long & Foster, in the event Long & Foster wished to pursue the claims in an attempt to recover some or all of the funds reimbursed to the agents. Thus, each agent executed a written assignment in favor of Long & Foster of his or her contract claims against Pardoe. In so doing, the agents retained no residual interest in the assigned claims. Indeed, it was agreed between the parties that in the event Long & Foster was unable to recover any amount from Pardoe on the assigned claims, the agents would still have no obligation to return any of the funds to Long & Foster; instead, it was agreed that Long & Foster was "out" that amount regardless of the outcome of any subsequent litigation against Pardoe.

In January 2004, Long & Foster, relying on the assignments, filed a breach of contract action in Fairfax County Circuit Court against NRT, the current owner and operator of Pardoe. The 58 individual real estate agents were named as additional plaintiffs. *See Long & Foster Real Estate, et al. v. NRT Mid–Atlantic, Inc.,* Law No. 220116 (Va.Cir.Ct.2004). NRT promptly moved to dismiss the state action on the ground that the asserted claims did not "arise out of the same transaction or occurrence," as required for joinder under § 8.01–272 of the Virginia Code [3] and Rule 1:4(k) of the Rules of the Supreme Court of Virginia.[4] Following a hearing on May 7, 2004, the Circuit Court judge granted

---

**3.** That statute provides, in pertinent part, that "[i]n any civil action, a party may plead as many matters, whether of law or fact, as he shall think necessary [and][a] party may join a claim in tort with one in contract *provided that all claims so joined arise out of the same transaction or occurrence."* Va.Code § 8.01–272 (emphasis added).

**4.** Rule 1:4(k) states that "[a] party asserting either a claim, counterclaim, cross-claim, or third-party claim or a defense may plead alternative facts and theories of recovery against alternative parties, provided that such claims, defenses, or demands for relief so joined *arise out of the same transaction or occurrence."* Rule 1:4(k), Va. Sup.Ct. (emphasis added).

NRT's motion to dismiss, concluding that the action indeed asserted claims arising out of more than 150 separate transactions, in violation of Virginia's procedural rules. The Circuit Court judge therefore dismissed all but one of the alleged claims, allowing only the first claim of the first named individual agent to proceed in that action. It appears from the record that Long & Foster later nonsuited this remaining claim. *See* Va.Code § 8.01–380.

Thereafter, on November 1, 2004, Long & Foster—proceeding alone this time—filed the instant federal action against NRT on the basis of diversity of citizenship, relying on the same assignments and alleging the same contract claims that it had previously asserted in the state action. Specifically, Long & Foster now seeks to recover $423,484.09 from NRT, the exact amount Long & Foster paid to the individual agents as reimbursement for the amounts allegedly owed by Pardoe under the agents' respective independent contractor agreements. NRT filed a threshold motion to dismiss the action pursuant to Rules 12(b)(1), 20 and 21, Fed.R.Civ.P., arguing that the claims asserted by Long & Foster are, in reality, 150 separate and unrelated claims that have been improperly joined in a single federal action through various invalid assignments executed in favor of Long & Foster. The parties have presented both written and oral argument with respect to the issues raised in NRT's motion to dismiss and the matter is now ripe for disposition.

## II.

■ The starting point in the analysis requires a determination of the validity under Virginia law[5] of the assignments executed by the individual agents in favor of Long & Foster, for if these assignments were invalid from the outset, as NRT contends, then Long & Foster would have no contract claims to assert against NRT in this instance and the individual agents would remain the true owners of the claims.[6] It is therefore necessary to determine, as a threshold matter, whether the agents' assignments to Long & Foster of their respective contract claims against their former brokerage firm were valid assignments under Virginia law.

Virginia law expressly allows the assignment of a typical contract claim. Indeed, Virginia Code § 8.01–26 provides that "those causes of action for damage to real or personal property, whether such damage be direct or indirect, and *causes of action ex contractu are assignable.*" Va.

---

**5.** As this is a federal diversity suit, the substantive law and choice of law rules of the forum state—in this case Virginia—governs the alleged claims. *See Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614, 623–624 (4th Cir.1999) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). And, under Virginia choice of law rules, the law of the place of performance—which, again, is Virginia—governs contract payment and performance issues such as those involved here. *See Equitable Trust Co. v. Bratwursthaus Mgmt. Corp.,* 514 F.2d 565 (4th Cir.1975).

**6.** And, if the individual agents remain the true owners of the claims at issue, then Rules 20 and 21 of the Federal Rules of Civil Procedure would likely prohibit the agents from pursuing their claims collectively in a single action in federal court. Indeed, Rule 20(a), entitled "Permissive Joinder of Parties," provides, in part, that

> [a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

Rule 20(a), Fed.R.Civ.P. Rule 21, in turn, entitled "Misjoinder and Non–Joinder of Parties," provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just...." Rule 21, Fed.R.Civ.P.

Code § 8.01–26 (emphasis added). Thus, while torts and other claims for purely personal wrongs fall outside the scope of this provision,[7] ordinary breach of contract claims, such as those alleged here, are clearly assignable under the Virginia statute.[8]

Yet, this does not end the analysis, as NRT contends that the assignments were nonetheless prohibited under the Virginia Real Estate Regulations governing the receipt of improper brokerage commissions by real estate agents. The specific provision relied on by NRT in this regard is set forth at § 135–20–280 of Title 18 of the Virginia Administrative Code, which provides, in pertinent part, as follows:

> Actions resulting in an improper brokerage commission or fee include...[a]ccepting a commission or other valuable consideration, as a real estate salesperson or associate broker, from any person except the licensee's principal broker at the time of the transaction, for (i) the performance of any of the acts specified in [the applicable provisions of the Virginia Code]...or the regulations of the board or related to any real estate transaction, without the consent of the broker....

18 V.A.C. § 135–20–280(2).

Given this regulation, NRT essentially argues that the individual agents acted in violation of their professional obligations under Virginia law when they accepted reimbursement from Long & Foster for unpaid commissions related to multiple real estate transactions, without the consent of Pardoe, the agents' "principal broker at the time of the transaction[s]." NRT further contends that the agents' contemporaneous assignments to Long & Foster of their residual contract claims against their former brokerage firm for unpaid commissions were likewise prohibited by the subject regulation and hence invalid. The first step in the assessment of these competing contentions is to ascertain the legal effect of the Virginia Real Estate Regulations.

It is clear that the Virginia Real Estate Board, like all administrative agencies, derives its power solely from its authorizing legislation. Thus, Virginia Code § 54.1–2105, governing the general powers of the Real Estate Board, provides that "[t]he Board may do all things necessary and convenient for carrying into effect the provisions of this chapter and may promulgate necessary regulations." Va.Code § 54.1–2105.[9] In this regard, the enabling statute expressly states that "[n]o regulation shall be imposed upon any profession or occupation *except for the exclusive purpose of protecting the public interest....*" Va. Code § 54.1–100 (emphasis added). In-

---

**7.** *See, e.g., In re Musser,* 21 B.R. 446 (Bankr. Va.1982) (holding that a personal injury claim is not assignable under Virginia law); *City of Richmond v. Hanes,* 203 Va. 102, 122 S.E.2d 895 (1961) (recognizing that actions for purely personal wrongs are not assignable under Virginia law).

**8.** An exception to the Virginia statute governing assignments exists with respect to legal malpractice claims, as the Supreme Court of Virginia has ruled that § 8.01–26 "does not abrogate the common law rule which prohibits the assignment of legal malpractice claims in this Commonwealth." *MNC Credit Corp. v. Sickels,* 255 Va. 314, 497 S.E.2d 331, 333

(1998). Thus, the common law prohibition against the assignment of such claims continues to operate to "safeguard[ ] the attorney-client relationship which is an indispensable component of our adversarial system of justice." *Id.* at 334.

**9.** *See also Carpenter v. Virginia Real Estate Board,* 20 Va.App. 100, 455 S.E.2d 287, 289 (1995) (recognizing that the Board is granted specific authority under the Virginia Code and "has a general mandate to 'do all things necessary and convenient for carrying out the provisions of [Title 54, Chapter 21] [by] promulgat[ing] necessary regulations' ").

deed, the Commonwealth, by statute, regulation or otherwise, "cannot abridge [the right of every person to engage in any lawful profession]...except as a reasonable exercise of its police powers *when it is clearly found that such abridgement is necessary for the preservation of the health, safety and welfare of the public.*" Va.Code § 54.1–100 (emphasis added).

In accordance with this statutory mandate, the Virginia Real Estate Board is authorized to promulgate administrative regulations to protect the public from, *inter alia,* dishonest and incompetent real estate practitioners. *See* Va.Code § 54.1–201(5) (authorizing the Board "[t]o promulgate regulations...necessary to assure continued competency [in the profession and] to prevent deceptive or misleading practices by practitioners").[10] And, significantly, "[t]he mandate of the Code must be construed in a manner consistent with this purpose." *Carpenter,* 455 S.E.2d at 289; *see also* Va.Code § 54.1–2143 (providing that "[a]ny regulations adopted by the Virginia Real Estate Board shall be consistent with this article").

Given this statutory authority, it is settled that administrative regulations such as those adopted by the Virginia Real Estate Board, while "not controlling," are nonetheless entitled to some degree of deference. *Corns v. School Board of Russell County,* 249 Va. 343, 454 S.E.2d 728, 732 (1995) (stating that "[w]hile administrative regulations are not controlling, 'the construction accorded a statute by public officials charged with its administration is entitled to be given weight by the courts'")

(quoting *Bohle v. Henrico County School Board,* 246 Va. 30, 431 S.E.2d 36, 39 (1993)).[11] Thus, because the Virginia Real Estate Regulations are entitled to some deference, the next question presented is whether the regulation in issue prohibits the assignments that occurred here. A careful review of the regulatory language, as well as the purpose of the statutory and administrative scheme, compels the conclusion that it does not.

At the outset, it is important to note that the language of § 135–20–280(2), the specific regulation on which NRT relies, does not expressly prohibit the assignment of claims, whether such claims arise out of an independent contractor agreement between an agent and a broker or otherwise. Indeed, assignments of this or any other type are neither prohibited nor addressed in any portion of the Virginia Real Estate Regulations. And, because the viability of Long & Foster's claims against NRT hinges on the validity of the agents' *assignments* of their claims to Long & Foster, rather than on the agents' corresponding reimbursement by Long & Foster for the unpaid commissions, the lack of an express regulatory prohibition against assignments of this sort ends the matter. There is an obvious and significant distinction between (i) an agent's acceptance of a commission "or other valuable consideration" for performing acts related to a real estate transaction from someone other than the agent's principal broker at the time of the transaction and (ii) an agent's assignment to another party of a breach of contract claim that he has against a brokerage firm

---

10. *See also Carpenter,* 455 S.E.2d at 289 (recognizing that the Board "has the responsibility of maintaining ethical and competency standards for licensed real estate agents and brokers").

11. Although no Supreme Court of Virginia decision squarely addresses the weight courts should accord the Virginia Real Estate Regulations, it is reasonable to assume that regulations adopted by this particular administrative agency should be entitled to the same weight as those adopted by the Virginia School Board Association, as involved in *Corns,* as both agencies are granted similar authority to promulgate and enforce regulations under the Virginia Code.

under an independent contractor agreement. Indeed, while the former is clearly prohibited by the regulation at issue, the latter, equally clearly, is not.[12]

Apart from this critical distinction between assignments on the one hand, and the receipt of commissions or payments on the other, there are additional reasons to conclude that § 135–20–280(2)'s prohibition does not invalidate the assignments in this case. For example, it is clear that the individual agents were not, as the regulation requires, acting "as a real estate salesperson or associate broker" when they accepted the reimbursements from Long & Foster and simultaneously assigned their residual contract claims to Long & Foster. In other words, the agents did not accept the reimbursements for performing any real estate services or duties on Long & Foster's behalf. Rather, the reimbursements and assignments were both conditions of a negotiated employment arrangement, to induce the agents, as a collective group, to join Long & Foster. It is also apparent that the agents did not accept the reimbursements from Long & Foster or assign their claims to Long & Foster "at the time of" any of the pertinent real estate transactions such that the payments or assignments could somehow alter or influence the outcome of those real estate transactions. In sum, the regulation, by its plain terms, does not cover the circumstances at bar; it does not prohibit or even mention assignments and its terms do not specifically reach the reimbursements involved here.

Nor do the assignments run contrary to the apparent purpose of the specific regulation at issue, or indeed to the Virginia Real Estate Regulations as a whole. In this regard, it appears that the underlying purpose of 18 V.A.C. § 135–20–280(2)—the regulation on which NRT relies—is to protect the public from real estate agents who seek or accept payments or "kickbacks" from, say, prospective buyers or construction contractors, in order to influence the outcome of a particular real estate transaction.[13] Here, the assignments executed by the individual agents in favor of Long & Foster do not have the pernicious effect on the public contemplated by the subject

---

12. Apart from the particular assignment situation presented here, additional types of assignments of claims for real estate commissions might occur, for example, where a real estate agent has outstanding claims for commissions against a brokerage firm at the time he declares bankruptcy, or even dies. In those circumstances, the agent's live claims against the brokerage firm would be transferred, or "assigned," to the representing bankruptcy trustee or the deceased agent's estate. Like the instant assignments, these additional hypothetical types of assignments are not prohibited by the Virginia Real Estate Regulations.

13. Research revealed a dearth of administrative actions applying the particular regulation at issue, and the few reported actions applying the regulation were disciplinary proceedings before the Virginia Real Estate Board involving circumstances very different from those presented here. *See, e.g., In re: Kath-* *erine Inglefield,* File No.2001–01742, License #0225001639 (Final Opinion and Order No.2003–0413) (where the Virginia Real Estate Board ordered an agent to pay a $2,350 fine for, *inter alia,* accepting a leasing fee from someone other than her principal broker at the time of the transaction, in violation of 18 V.A.C. § 135–20–280(2)); *In re: Xin Tao,* File No.2001–02473, License #0225048492 (Consent Order No.2004–0032) (where the Virginia Real Estate Board ordered an agent to pay a $100 fine for accepting $20 per hour in cash from another licensed agent for being a "guide" and "sounding board" for purchasers in the course of various real estate transactions assigned to the other agent, in violation of 18 V.A.C. § 135–20–280(2)). While factually distinguishable from the instant case, these cases nonetheless serve to confirm that the overall purpose of the Virginia Real Estate Regulations is to protect the public interest against unscrupulous and incompetent agents.

regulation. Neither do the corresponding reimbursements paid to the agents by Long & Foster run contrary to the overall purpose of the statute and accompanying regulations. Instead, both the reimbursements and the corresponding assignments were negotiated and entered into by the individual agents and Long & Foster as private parties, without regard to, or affect on, the outcome of any underlying residential real estate transactions that might affect the public.

Although NRT argues that pursuant to the Supreme Court of Virginia's holding in *Harrison & Bates v. LSR Corp.*, 238 Va. 741, 385 S.E.2d 624 (1989), the subject regulation should apply equally to bar assignments and reimbursements between private parties such as those involved in this action, a careful review of that decision leads to the conclusion that it is based on different facts and actually supports the result reached here. Indeed, *Harrison & Bates* merely stands for the proposition that a real estate broker not licensed in the state where a real estate transaction occurs cannot recover commissions for services performed in connection with that transaction, notwithstanding the existence of a commission-sharing agreement entered into with another agent licensed in the state of the transaction.[14] Unlike a

rule prohibiting the assignment of claims between private parties, the holding in *Harrison & Bates* clearly serves to protect the public interest, as it prevents real estate agents and brokerage firms from recovering commissions for performing real estate services in states other than their respective states of licensure.

Accordingly, because the assignments of the individual agents' contract claims to Long & Foster are permissible under the Virginia Code, and because the applicable Virginia Real Estate Regulations neither expressly, nor implicitly by their purpose, prohibit the assignment of claims of this sort, the instant assignments are thus valid under Virginia law.

**III.**

Given that the assignments are valid under Virginia law, the next question presented is whether Long & Foster, as the real party in interest,[15] can assert all of its assigned contract claims against NRT in a single action in this federal forum. Rule 18, Fed.R.Civ.P., is dispositive of this issue, as it expressly provides that "[a] party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, *as many claims*, legal, equitable, or maritime, *as the*

---

**14.** The principal issue presented in *Harrison & Bates* was whether a corporation, licensed as a real estate broker under the laws of a sister state, but not under the laws of Virginia, could enforce a contract with a real estate broker licensed in Virginia to split commissions earned on the sale of real estate in Virginia. *See Harrison & Bates*, 385 S.E.2d at 625. On these facts, the trial court concluded "that because the licensing statutes were designed to protect the public from incompetence and fraud practiced by unregulated persons, those statutes should be interpreted to apply always to contracts between broker and client but never to contracts between broker and broker" such as the commission-sharing agreement involved in that case. *Id.* at 627. Yet, the Supreme Court of Virginia

disagreed, holding instead that "the requirement that those who act as a real estate broker in Virginia be licensed in Virginia extends not only to those who enter into a compensation contract with a seller or a purchaser but also to those who contract with each other to share commissions earned by the performance of such acts." *Id.* at 627.

**15.** *See, e.g.,* Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, 6A *Federal Practice and Procedure*, § 1545 (recognizing that "[u]nder present law an assignment passes the title to the assignee so that he is the owner of any claim arising from the chose and should be treated as the real party in interest").

*party has against an opposing party."* Rule 18(a), Fed.R.Civ.P. (emphasis added). In other words, Rule 18 allows "[a] single plaintiff [to]...join as many claims as it has against a particular defendant," regardless of whether those claims arose out of the same transaction or occurrence.[16] *Allstate Insurance Co. v. Hechinger Co.,* 982 F.Supp. 1169, 1171 (E.D.Va.1997) (citing Rule 18(a), Fed.R.Civ.P.).

■■■ Thus, provided Long & Foster meets the jurisdictional amount in controversy, it may assert here under Rule 18 as many legal or equitable claims that it has against NRT, a corporation with diverse citizenship.[17] In this regard, Long & Foster seeks a total of $423,484.09 from NRT in this action, which amount is comprised of numerous smaller claims, each of which is individually below the jurisdictional amount in controversy. Nonetheless, it is settled that where multiple claims against a particular defendant are properly joined under Rule 18, as here, "a plaintiff may also aggregate the damages sought in each claim to meet the amount-in-controversy requirement of § 1332(a)." *Hechinger,* 982 F.Supp. at 1171.[18] And, this is true "even if no individual claim exceeds the jurisdictional amount," as is the case here.[19] The aggregation of damages rule also operates whether or not a single plaintiff's asserted claims against a defendant "arise out of the same transaction or occurrence." *Id.* at 1171 n. 4 (citing Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 6A *Federal Practice and Procedure* § 1588 at 537 (2d ed.1990)).[20] In light of

16. This liberal federal pleading rule is much broader than the corresponding Virginia procedural rule, which requires that all claims alleged in a single action "arise out of the same transaction or occurrence." Va.Code § 8.01–272 (stating that "[i]n any civil action, a party may plead as many matters, whether of law or fact, as he shall think necessary [and][a] party may join a claim in tort with one in contract *provided that all claims so joined arise out of the same transaction or occurrence"*) (emphasis added). Likewise, Rule 1:4(k) of the Rules of the Supreme Court of Virginia provides, in part, that

[a] party asserting either a claim, counterclaim, cross-claim, or third-party claim or a defense may plead alternative facts and theories of recovery against alternative parties, provided that such claims, defenses, or demands for relief so joined *arise out of the same transaction or occurrence.*
Rule 1:4(k), Va. Sup.Ct. (emphasis added). Indeed, it is precisely because of these strict Virginia procedural rules that Long & Foster was not able to pursue the instant claims against NRT in a single action in state court, its preferred forum.

17. The parties do not dispute that they are diverse citizens. As previously noted, Long & Foster is a Virginia corporation with its principal place of business in Virginia, while NRT is a Maryland corporation with its principal place of business in New Jersey. *See* 28 U.S.C. § 1332(c)(1).

18. In contrast, "[m]ultiple plaintiffs...can aggregate their claims only if they are suing on a shared right or undivided interest, such as when both plaintiffs are parties to the same contract." *Hechinger,* 982 F.Supp. at 1171 (citing *Feikema v. Texaco, Inc.,* 16 F.3d 1408, 1412 (4th Cir.1994) and *Glover v. Johns–Manville Corp.,* 662 F.2d 225, 231–32 (4th Cir. 1981)).

19. *Hechinger,* 982 F.Supp. at 1171 (citing *Edwards v. Bates County,* 163 U.S. 269, 273, 16 S.Ct. 967, 41 L.Ed. 155 (1896) and *Shanaghan v. Cahill,* 58 F.3d 106, 109 (4th Cir. 1995)).

20. The principles set forth in *Hechinger* have been relied on in several subsequent decisions, as well. *See, e.g., Allstate Ins. Co. v. Wal–Mart Stores, Inc.,* 2000 WL 960736 (N.D.Ill. July 11, 2000) (unpublished) (where a plaintiff, as the subrogee of 15 insureds who suffered similar fire losses in several different states, was permitted to aggregate the claims and continue the case in a single suit against the manufacturers and retailer of the lamps that allegedly caused the fires); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 74 F.Supp.2d 221 (E.D.N.Y.1999) (citing *Hechinger* for the principle that "a subrogee

these principles, as well as the liberal federal pleading requirements set forth in Rule 18, Fed.R.Civ.P., it is clear that, assuming all other statutory requirements are met, *see infra* Part IV, Long and Foster may properly assert all of its assigned claims against NRT in a single action in this forum and may also aggregate the claims to meet the jurisdictional amount in controversy requirement.

## IV.

Despite the liberal federal pleading requirements, a plaintiff's ability to assert and aggregate assigned claims against a particular defendant in federal court is not without limitations. To the contrary, 28 U.S.C. § 1359 provides that "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359. The purpose of this statutory provision is clear, namely to prevent the "manufacture of Federal jurisdiction" by means of assignment or otherwise. *See Kramer v. Carribbean Mills Inc.,* 394 U.S. 823, 829, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969). Put differently, Congress, in enacting § 1359, sought to prevent "a vast quantity of ordinary contract and tort litigation [from being] channeled into the federal courts at the will of one of the parties." *Id.* at 828, 89 S.Ct. 1487.[21]

Thus, the remaining question presented is whether the instant assignments from the individual real estate agents to Long & Foster pass muster under § 1359. In this regard, once jurisdiction is challenged under § 1359, as here, the party asserting jurisdiction—in this case Long & Foster—bears the burden of proving that jurisdiction in fact exists. *See Pasquotank Action Council, Inc. v. City of Virginia Beach,* 909 F.Supp. 376, 382 (E.D.Va.1995) (citing *McNutt v. General Motors Accept. Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). Moreover, district courts must "carefully scrutinize" transfers or assignments which have the effect of creating federal diversity jurisdiction, as did the instant assignments to Long & Foster. *See id.* at 382 (citing *Prudential Oil Corp. v. Phillips Petroleum Co.,* 546 F.2d 469, 474 (2d Cir.1976)).

The leading Supreme Court decision on the subject of collusive assignments is *Kramer v. Carribbean Mills, Inc.,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969). In that case, Carribbean Mills—a Haitian corporation—entered into a contract with a Panamanian corporation to purchase certain shares of the Panamanian corporation's stock. When Carribbean Mills later failed to make timely payments for the stock, the Panamanian corporation assigned its entire interest in the Carribbean Mills contract to Kramer, a Texas attorney, for the stated consideration of one dollar. By a separate agreement dated the same day, Kramer promised to reimburse the Panamanian corporation 95 percent of any net recovery that he received from Carribbean Mills on the assigned cause of action, "solely as a Bonus." *Kramer,* 394 U.S. at 827–28, 89 S.Ct. 1487. Shortly thereafter, Kramer filed a breach of contract action against Carribbean Mills in the Northern District of Texas, on the

---

may aggregate its own claims to meet the amount-in-controversy requirement of diversity jurisdiction").

**21.** *See also Bishop v. Hendricks,* 495 F.2d 289, 294 (4th Cir.1974) (recognizing that § 1359 was enacted for the purpose of denying the use of federal courts in suits which do not "really and substantially" involve a dispute or controversy properly within the jurisdiction of federal courts); *Lester v. McFaddon,* 415 F.2d 1101, 1104 (4th Cir.1969) (recognizing that the purpose of § 1359 is "to exclude from the diversity jurisdiction purely local controversies with no more than a contrived interstate appearance").

basis of diversity of citizenship. The district court denied Carribbean Mills' threshold motion to dismiss for a lack of jurisdiction and the case proceeded to trial, resulting in a jury verdict in Kramer's favor. Later, on appeal, the Fifth Circuit reversed, holding that the Panamanian corporation's assignment to Kramer of its contract claim against Carribbean Mills was "improperly or collusively made" under § 1359, and, thus, that the district court lacked jurisdiction over the matter. The Supreme Court granted certiorari and ultimately affirmed the Fifth Circuit's decision. After examining the totality of the circumstances, the Supreme Court found that "[w]hen the assignment to Kramer is considered together with his total lack of previous connection with the matter and his simultaneous reassignment of a 95%

interest back to Panama, there can be little doubt that the assignment was for the purposes of collection, with Kramer to retain 5% of the net proceeds 'for the use of his name and his trouble in collecting.' " [22] *Kramer,* 394 U.S. at 827–28 (citation omitted).

■ Since *Kramer,* courts have considered a variety of factors in the § 1359 "totality of the circumstances" analysis, including, *inter alia,* (i) whether there was nominal or no consideration involved in the assignment; [23] (ii) whether the assignee had any previous connection to the assigned claim; (iii) whether there was a legitimate business reason for the assignment; [24] (iv) whether the timing of the assignment suggests that it was merely an effort to secure federal diversity jurisdiction; [25] (v) whether the assignor exercises

---

22. The Supreme Court also noted in *Kramer* that given the facts presented, it had "no occasion to re-examine the cases in which this Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not 'improperly or collusively made,' regardless of the transferor's motive." *Kramer,* 394 U.S. at 828 n. 9, 89 S.Ct. 1487 (citations omitted). That statement is significant here, as it appears clear from this record that the individual agents retained no residual interest in their contract claims against their former brokerage firm once the claims were assigned to Long & Foster. In other words, the instant assignments were "absolute," which the Supreme Court recognized was dispositive of the § 1359 issue. *See id.*

23. *See, e.g., Pasquotank Action Council, Inc. v. City of Virginia Beach,* 909 F.Supp. 376 (E.D.Va.1995) (holding that the conveyance of land to a nonprofit entity was collusive under § 1359, thus barring federal jurisdiction over the nonprofit entity's state law claim that the city was unlawfully occupying the land, where the conveyance was without any consideration, the grantor retained a strong collateral interest in the case in that he would be free to develop the land if the city was ousted, and there was evidence of collusion between the grantor and the attorney for the nonprofit entity).

24. *See, e.g., Bullard v. City of Cisco, Texas,* 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254 (1933) (finding no collusion under § 1359 where the transfer of bonds to a bondholders' committee was made for the purposes of conserving, salvaging and adjusting the investment on behalf of the bondholder beneficiaries, as the purpose of the agreement "was not to create a mere collection agency, nor to set up a merely colorable device for circumventing restrictions on federal jurisdiction"); *Walk Haydel and Associates, Inc. v. Coastal Power Production Co.,* 934 F.Supp. 209 (E.D.La.1996) (finding that "entering into a transaction solely as a tactical device to gain access to federal courts is prohibited by § 1359"); *Airlines Reporting Corp. v. S and N Travel, Inc.,* 857 F.Supp. 1043 (E.D.N.Y.1994) (recognizing that if an assignment is made for a facially valid business purpose, and not simply to invoke federal jurisdiction, then the assignment is valid under § 1359 and the citizenship of the assignee is used to determine diversity jurisdiction).

25. *See, e.g., Canton Indus. Corp. v. Mi–Jack Products, Inc.,* 944 F.Supp. 853 (D.Utah 1996) (finding collusion under § 1359 where, *inter alia,* an assignment of a claim was made one day before the assignee filed suit in federal court).

any control over the conduct of the litigation;[26] and (vi) whether the assignor retains any interest in the action, *i.e.*, is the assignor to receive a percentage of the assignee's recovery.[27] With these factors in mind, the totality of the circumstances of the instant case points persuasively to a finding against collusion.

■ First, the agents' assignments of their claims to Long & Foster were clearly given in return for adequate consideration, as Long & Foster reimbursed the agents the exact amount—dollar for dollar—that the agents believed they were due under their respective independent contractor agreements with Pardoe. And, while Long & Foster had no previous connection to the agents' contract claims prior to the assignments, a legitimate business reason exists for the assignments and corresponding reimbursements to the agents, namely to induce the 58 individual agents to commence employment, as a collective group, with Long & Foster. The timing of the assignments is also inconsistent with an underlying purpose of obtaining federal jurisdiction, as Long & Foster first pursued its assigned claims in the Fairfax County Circuit Court.[28] Indeed, it appears from the record that state court, rather than federal court, was Long & Foster's preferred forum in this instance, but that it was foreclosed from pursuing its assigned claims in a single action in state court under Virginia's procedural rules. Moreover, while the individual agents have agreed to serve as witnesses in this action on Long & Foster's behalf, if necessary, they clearly will not exercise any discretion or control over the litigation or the conduct of plaintiff's counsel throughout the course of the proceedings. Rather, plaintiff's counsel represents that he answers only to the instructions of Long & Foster, his sole client in this action. Finally, it is important to reiterate that the agents retain no residual interest in either this specific litigation or in their contract claims against their former brokerage firm. Indeed, in the event Long & Foster does not prevail in this action, the agents are not obligated to return to Long & Foster any of the reimbursed funds that they received as part and parcel of their employment package. Instead, the agents remain fully compensated regardless of whether Long & Foster is ultimately able

**26.** *See Nike, Inc. v. Comerical Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987 (9th Cir.1994) (finding collusion under § 1359 where, *inter alia*, a parent corporation sought to maintain control over the litigation of a contract claim assigned to its subsidiary).

**27.** *See, e.g., Farmington Village Corp. v. Pillsbury*, 114 U.S. 138, 5 S.Ct. 807, 29 L.Ed. 114 (1885) (finding a collusive arrangement to create federal jurisdiction where several Maine citizens transferred various bond coupons issued to them by a village in Maine to a citizen of Massachusetts, who in return gave the Maine citizens a non-negotiable two-year note for $500 and a promise to pay back 50% of the net amount recovered above $500 in a suit to test the bonds' validity in federal court); *Boston Post Road Medical Imaging v. Allstate Ins. Co.*, 2004 WL 830154 (S.D.N.Y. April 13, 2004) (unpublished) (finding no collusion under § 1359, in an action where 44 patients had assigned their no-fault insurance benefits to the plaintiff medical facility in exchange for medical services, where, *inter alia*, (i) the facility was not suing in a representative capacity, (ii) none of the patient/assignors were liable to the facility for the medical services they received, and (iii) the facility would not be compensated for the medical services it provided to the assignees if it was unsuccessful in the action).

**28.** *Cf. Weniger v. Union Center Plaza Associates*, 387 F.Supp. 849 (D.C.N.Y.1974) (recognizing that § 1359 does not apply where a defendant has invoked federal jurisdiction by removing a case from state to federal court); *Arant v. Stover*, 307 F.Supp. 144 (D.C.S.C. 1969) (recognizing that § 1359 does not apply to cases that are removed from state to federal court).

to recover some or all of the reimbursed funds from NRT.

Based on a review of the totality of the circumstances presented here, it is clear that the agents' assignments of their contract claims to Long & Foster in this instance did not have the primary purpose of creating federal diversity jurisdiction in violation of § 1359.[29] In other words, because the assignments were not "improperly or collusively made" to invoke federal jurisdiction, Long & Foster's pursuit of its assigned contract claims against NRT in this forum is not prohibited under § 1359. Accordingly, NRT's threshold motion to dismiss the action must be denied.

## V.

The circumstances of this case present the rare situation where a single plaintiff is able to assert and aggregate 150 separate and distinct claims against a single defendant in federal court through the receipt of valid assignments. The obvious procedural complexities this case presents may be addressed or simplified by way of severance,[30] grouping of similar claims, alternative dispute resolution, or as otherwise permitted under the Federal Rules of Civil Procedure.

An appropriate Order will issue.

---

**29.** *See Airlines Reporting Corp. v. S and N Travel, Inc.*, 58 F.3d 857 (2d Cir.1995) (recognizing that § 1359 should be broadly construed to bar any agreement whose "primary aim" is to concoct federal diversity jurisdiction).

**30.** *See* Rule 20, Fed.R.Civ.P. (permitting district courts to "order separate trials or make other orders to prevent delay or prejudice"); Rule 21, Fed.R.Civ.P. (providing that "[a]ny claim against a party may be severed and proceeded with separately").