# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3051

_____

The Branson Label, Inc., a Florida Corporation

*Plaintiff - Appellant*

v.

City of Branson, Missouri; Empire District Electric Co.; HCW Development
Company, LLC; HCW Private Development, LLC; HCW North, LLC

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: February 12, 2015
Filed: July 17, 2015

_____

Before RILEY, Chief Judge, LOKEN and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

The Branson Label, Inc., a Florida corporation ("Florida Branson Label"),
appeals the district court's[1] dismissal of its suit. The district court found that Florida

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western
District of Missouri.

Branson Label collusively manufactured subject-matter jurisdiction in violation of 28 U.S.C. § 1359. Florida Branson Label argues that the district court erred by adopting the wrong legal test for determining collusion. Further, it argues that the corporate acts leading up to the commencement of this action were not done to manufacture diversity but were motivated by legitimate business purposes. We affirm.

## I. *Background*

This action and related actions in Missouri state court chronicle the decade-long dispute over ownership of 27 acres of land in Branson, Missouri. Florida Branson Label claims that it has an unbroken chain of title to this land that can be traced back to the 1950s. Through a quitclaim deed, the land was passed from the original owners to Tori, Inc. ("Tori"). Tori was administratively dissolved, and through various quitclaim transactions, Peter and Darlene Rea acquired the land. In 1992, the Reas quitclaimed the deed to the Branson Label, a Missouri corporation ("Missouri Branson Label") that they owned. Florida Branson Label was merged with Missouri Branson Label, therefore acquiring the ownership interest in the land. Thus, Florida Branson Label alleges that the City of Branson, Missouri; the Empire District Electric Company; HCW Development Company, LLC; HCW Private Development, LLC; and HCW North, LLC (collectively, "Appellees") infringed on its property rights by breaking ground on its land on May 15, 2004, to develop the Branson Landing, a mixed-use retail, residential, and entertainment complex.

In addition to Florida Branson Label's claim, Douglass Coverdell also claims ownership of the disputed land. Coverdell's claim to title arises from Tori's quitclaim

of the deed to him in 1999.[2] Coverdell's claim of ownership has spurred at least two actions in the Circuit Court of Taney County.[3]

Marvin Elfant, a businessman living in Florida, has funded Coverdell's lawsuits through his businesses Nekome, LLC ("Nekome") and ME Holdings, LLC ("ME Holdings"). Both Nekome and ME Holdings are Delaware LLCs, but Elfant runs their operations from his home in Florida. Elfant's investment in the Coverdell actions, however, suffered setbacks in May, June, and August 2013, when Missouri state courts issued rulings adverse to Coverdell's claim of ownership.

In the spring of 2013, the Reas entered negotiations with Elfant for Nekome to buy Missouri Branson Label. On July 18, 2013—after the Coverdell actions sustained negative decisions from the state courts—an oral agreement was reached for Nekome to acquire Missouri Branson Label. In a memorandum to Elfant, his tax advisors described "the acquisition of the stock of [Missouri Branson Label]" as being "deemed by [Elfant] to be an important element in the legal strategy to realize a success[] on [his] investment." The Reas did not initially comply with the oral agreement, and Elfant had to sue the Reas to settle the matter.

On May 2, 2014, Nekome finally acquired Missouri Branson Label. Only days before, Elfant sought and received advice from his tax advisors that merging Missouri Branson Label into an out-of-state corporation would be sufficient to avoid Missouri state taxes on any legal award that might come from Missouri Branson Label's claim

---

[2]Ironically, Coverdell sued the Reas in 2014 alleging that the Reas themselves created his competing claim of title when they quitclaimed the deed to him through Missouri Branson Label, which he alleged was the mere alter ego of Tori. *See Coverdell v. The Branson Label, Inc.*, No. 1422-CC00761 (Cir. Ct. St. Louis 2014).

[3]*See Empire Dist. Co. v. Douglas Coverdell*, No. 03-CV-787034 (Cir. Ct. Taney Cnty. 2013); *U.S. Bank v. Coverdell*, No. 11-AF-CC00244 (Cir. Ct. Taney Cnty. 2012).

to the land. On May 8, 2014, Nekome became the sole member in a newly formed company, Florida Branson Label. On May 9, Nekome merged Missouri Branson Label into Florida Branson Label, effectively transferring the former's legal claim of owning the disputed land to the latter. A few days later on May 14, 2014, Florida Branson Label filed the instant suit in federal district court asserting diversity jurisdiction on account of its Florida citizenship and the Appellees' Missouri citizenships. Since filing suit, Elfant has admitted that the only business activity that Florida Branson Label conducts includes "directing and overseeing this lawsuit and a second lawsuit pertaining to the [disputed land] . . . ; conferring with and directing counsel in connection with the Branson Label Lawsuits; reviewing and revising pleadings, declarations, and other court papers in connection with the Branson Label Lawsuits; and funding the Branson Label Lawsuits."

The Appellees moved to dismiss the case for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and the district court granted the motion. The court found that Florida Branson Label's corporate maneuvers were done to manufacture diversity in violation of 28 U.S.C. § 1359; further, the court found that the purported tax purpose for merging the Missouri and Florida Branson Labels was merely pretextual to obtaining diversity jurisdiction. In coming to this conclusion, the district court utilized the following six-factor test employed by courts outside of this circuit:

> (1) whether there was nominal or no consideration involved in the assignment; (2) whether the assignee had any previous connection to the assigned claim; (3) whether there was a legitimate business reason for the assignment; (4) whether the timing of the assignment suggests it was merely an effort to secure federal diversity jurisdiction; (5) whether the assignor exercises any control over the conduct of the litigation; and (6) whether the assignor retains any interest in the action such as receiving a portion of the assignee's recovery.

-4-

*Hytken Family Ltd. v. Schaefer*, 431 F. Supp. 2d 696, 699–700 (S.D. Tex. 2006) (citing *Long & Foster Real Estate, Inc. v. NRT Mid–Atl., Inc.*, 357 F. Supp. 2d 911, 922–23 (E.D. Va. 2005)). After finding that each factor weighed against exercising subject-matter jurisdiction, the district court dismissed the case.

## II. *Discussion*

Florida Branson Label argues on appeal that the district court's adoption of the six-factor test was improper because it did not consider the totality of the circumstances. Further, Florida Branson Label argues that even if the six-factor test was the proper legal standard, the test weighs in favor of exercising subject-matter jurisdiction.

"We review de novo the grant of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)." *Great Rivers Habitat Alliance v. Fed. Emergency Mgmt. Agency*, 615 F.3d 985, 988 (8th Cir. 2010) (quotation and citation omitted). First, "[a] court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). In a facial attack, "the court merely [needs] to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Menchaca*, 613 F.2d at 511 (citation omitted). Accordingly, "the court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn*, 918 F.2d at 729 n.6 (internal citations omitted).

Conversely, in a factual attack, "the existence of subject matter jurisdiction [is challenged] in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Menchaca*, 613 F.2d at 511 (citation omitted). Thus, the nonmoving party would not enjoy the benefit of the allegations in its pleadings being accepted as true by the reviewing court. *See*

*Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008) (stating courts must "accept all factual allegations in the pleadings as true" for facial attacks). "Under 28 U.S.C. § 1359, whether an assignment was improperly made to manufacture diversity jurisdiction is a fact-intensive question . . . ." *Nat'l Fitness Holdings, Inc. v. Grand View Corporate Centre, LLC*, 749 F.3d 1202, 1205 (10th Cir. 2014). As a result, the parties in this case substantially developed the record, and the district court considered evidence outside the scope of the pleadings. Thus, we consider Appellees' challenge under § 1359 to be a factual attack in which the allegations in Florida Branson Label's complaint will not be assumed to be true.

Second, we must determine the proper standard of review on appeal of factual issues. *See Osborn*, 918 F.2d at 730. "True, we review the ultimate question of whether diversity jurisdiction exists de novo. But we review the district court's factual findings under the clear-error standard, and whether an assignment passes muster under § 1359 is a fact question subject to that deferential standard." *Nat'l Fitness*, 749 F.3d at 1206 (internal citations omitted); *see also E3 Biofuels, LLC v. Biothane, LLC*, 781 F.3d 972, 975 (8th Cir. 2015) ("[W]hether diversity jurisdiction was wrongfully manufactured through assignment, is a question of fact, which we review for clear error.").[4]

_____

[4]In *Osborn*, we adopted the rule that if the challenge to subject-matter jurisdiction is based on "the complaint supplemented by undisputed facts evidenced in the record, the appellate court's review is 'limited to determining whether the district court's application of the law is correct and . . . whether those facts are indeed undisputed.'" 918 F.2d at 730 (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). This rule is inapplicable to § 1359 challenges because whether a plaintiff collusively manufactured diversity is always a question of fact. *E3 Biofuels*, 781 F.3d at 976; *Nat'l Fitness*, 749 F.3d at 1206. Thus, the district court's factual determination of whether a plaintiff collusively manufactured diversity will be reviewed under a clear-error standard.

A. *Factors to Consider in Assignments Challenged Under § 1359*

First, we address whether the district court erred using a six-factor test to determine if a party colluded to manufacture diversity. This court has seldom analyzed § 1359, and when we have, it was in the materially different context of estates or injured plaintiffs appointing out-of-state executors to prosecute tort actions in federal courts. *See, e.g.*, *Rogers v. Bates*, 431 F.2d 16 (8th Cir. 1970); *Todd Cnty., Minn. v. Loegering*, 297 F.2d 470 (8th Cir. 1961); *McCoy v. Blakely*, 217 F.2d 227 (8th Cir. 1954). Thus, we seek guidance from persuasive authority.

Florida Branson Label argues that the correct legal standard should be a consideration of the totality of the circumstances. Therefore, it argues that the district court's six-factor test is too mechanical. We disagree. The statement of a nonexclusive and nonexhaustive list of considerations does not preclude consideration of all circumstances relevant to a legal determination. The mere listing of factors is not as limiting as some so-called legal tests. Ironically, the very courts that have used the appellant's favored "totality of the circumstances" standard consider many of the same factors used by the district court in this case. *See Nat'l Fitness*, 749 F.3d at 1205–06; *Yokeno v. Mafnas*, 973 F.2d 803, 810 (9th Cir. 1992). In *National Fitness*, for example, the Tenth Circuit stated that an analysis of § 1359 turns on "the totality of the circumstances." 749 F.3d at 1205. Immediately thereafter, the Tenth Circuit outlined seven factors to consider, including the following: (1) "Did the assignee lack a prior connection with the matter?"; (2) "Did the assignor select the assignee's attorney and pay the assignee's litigation expenses?"; (3) "Did the assignor retain control of the litigation?"; (4) "Did the assignee agree to pay the assignor a portion of any recovery?"; (5) "Did the assignee provide meaningful consideration for the assignment?"; (6) "Is the assignment's timing suspicious?"; and (7) "Was the assignment motivated by a desire to create diversity jurisdiction?" *Id.* at 1205–06. These queries do not strike us as an overly mechanical, discretion-limiting test that fails to consider the totality of the circumstances. Rather, *National Fitness* seems to simply list some factual considerations that should not be overlooked when

determining whether collusion occurred. These factors are the product of controlling and persuasive precedent of several well-reasoned opinions.[5]

We need not adopt the Tenth Circuit's precise test and thus leave that question for another day. When considering "[t]he evidence as a whole," *Loegering*, 297 F.2d at 474, we conclude that the district court's analysis sufficiently addressed factors relevant to a determination of whether an assignment of a legal claim functioned as part of a scheme to manufacture diversity jurisdiction. While we do not adopt the Tenth Circuit's precise list of circumstances, we do consider its list to be a helpful guide to the sorts of facts and circumstances to be considered. Thus, district courts should consider factors such as the following when determining whether an assignment of a legal claim is precluded from invoking diversity jurisdiction under § 1359: (1) whether the assignee had any previous connection to the assigned claim; (2) whether the assignee has any assets other than the assigned claim and has any

---

[5]*See id.*; *see also Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 827–28 (1969) (considering previous connection of assignee to the action, exchange of meaningful consideration, and retention of interest by assignor); *Land Holdings (St. Thomas) v. Mega Holdings*, 283 F.3d 616, 620 (3d Cir. 2002) (considering retention of interest by assignor, underlying motive, and exchange of consideration); *Airlines Reporting Corp. v. S & N Travel*, 58 F.3d 857, 863–64 (2d Cir. 1995) (considering timing of assignment, exchange of meaningful consideration, and underlying motive); *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 991 (9th Cir. 1994) (considering timing of assignment, preexisting interest of assignee, underlying motive, and exchange of meaningful consideration); *Yokeno*, 973 F.2d at 812 (considering underlying motive and exchange of meaningful consideration); *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 871 (10th Cir. 1981) (considering underlying motive and the exchange of meaningful consideration); *Reinhart Oil & Gas, Inc. v. Excel Directional Techs., LLC*, 463 F. Supp. 2d 1240, 1245 (D. Colo. 2006) (outlining precedent of "totality of circumstances" factors); *Long & Foster*, 357 F. Supp. 2d at 922–23 (same).

business functions other than pursuing the litigation;[6] (3) whether there was meaningful or merely nominal consideration for the assignment; (4) whether the timing of the assignment suggests it was primarily executed to secure federal diversity jurisdiction; (5) whether the assignor retains any control or influence over the conduct of the litigation or the assignee's attorney; (6) whether the assignor retains any interest in the outcome of the litigation; (7) whether the assignment was motivated, at least in part, by a desire to create diversity jurisdiction; and (8) the extent the party asserting diversity jurisdiction can rebut any claim of collusion by asserting a legitimate business purpose for the assignment. Because the district court's analysis closely mirrored this list of considerations, we find no reversible error.

B. *Application of Factors*

We now turn to the application of the outlined factors to the instant case. Florida Branson Label argues that even if the district court articulated the correct legal standard, it failed to properly administer it.

"The burden of establishing that a cause of action lies within the limited jurisdiction of the federal courts is on the party asserting jurisdiction . . . ." *Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.*, 551 F.3d 812, 816 (8th Cir. 2009) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Heightened scrutiny compounds this burden on Florida Branson Label because its assignment was made between closely related business entities. *See Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469, 475 (2d. Cir. 1976) ("The scrutiny normally applied to transfers or assignments of claims which have the

---

[6]*See Greater Dev. Co. of Conn. v. Amelung*, 471 F.2d 338, 339 (1st Cir. 1973) (finding that diversity was collusively manufactured in violation of § 1359 where "the claim which is the basis of this suit was the only asset transferred, and, as far as the record shows, the only asset of the new corporation, which apparently has no payroll and no other activities"); *see also Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 645 (1st Cir. 1995).

effect of creating diversity must be doubled in the case of assignments between related or affiliated corporations . . . .").

The First Circuit addressed a similar situation dealing with a merger of a company into a diverse plaintiff company in *Toste Farm*. In that case, a company that was a citizen of Rhode Island brought suit in federal court but later voluntarily dismissed its case because there was a lack of full diversity of citizenship. 70 F.3d at 641–42. A month later, the Rhode Island company was merged into a New York company that was created earlier in the year, transferring all of its assets to the new company. *Id.* at 642. The New York company then brought suit one month later in federal court asserting diversity jurisdiction. *Id.* The First Circuit emphasized that the merged companies had only one asset of value: their legal claim. *Id.* at 645. Additionally, the Rhode Island company transferred a bank account of approximately $200,000 to the new company, but the court dismissed this asset as a mere "make-weight[]." *Id.* The newly formed company also admitted that the merger was at least partly motivated by a desire to enjoy diversity jurisdiction. *Id.*

Similar to *Toste Farm*, the record in this case reveals that Missouri and Florida Branson Labels merged primarily to invoke diversity jurisdiction as proscribed by § 1359. First, Florida Branson Label had no previous connection to the assigned claim. The lack of such a prior connection causes Florida Branson Label to resemble an out-of-state executor with no actual interest other than being the vehicle to invoke diversity jurisdiction. *See Loegering*, 297 F.2d at 473. Notably, Florida Branson Label was created only days before the instant action was filed. *See Amelung*, 471 F.2d at 339 (noting that a diverse plaintiff company was formed and assigned a legal interest merely four hours before suit was filed).

Second, neither Missouri nor Florida Branson Labels has any assets other than the legal claim of ownership to the disputed land. This is more indicative of collusion than even *Toste Farm*, in which an additional $200,000 was also transferred in the

-10-

merger between companies, yet the court still deemed it as a "make-weight" in context. 70 F.3d at 645. Additionally, Elfant admitted that Florida Branson Label's only business activity is litigating the current and a related action.

Third, there was no consideration for the assignment. At the time of the merger, Nekome owned both Branson Labels. Nekome merged the two companies without giving any consideration to Missouri Branson Label. Because this was not an arms-length transaction, no consideration was necessary for the merger. Elfant, who effectively owned Nekome, signed the merger documents on behalf of both Missouri and Florida Branson Labels. The lack of consideration and an arms-length transaction between subsidiaries only makes the possibility of collusion to manufacture diversity more likely.

Florida Branson Label argues that the court should broaden its view of the transaction and take into account the nearly year-long negotiation with the Reas. This argument has no merit because the consideration given to the Reas to acquire Missouri Branson Label is outside the scope of the assignment at issue. Florida Branson Label itself admits that its chain of title comes through Missouri Branson Label, the company to which the Reas quitclaimed their deed in 1992. Thus, the Reas are not the applicable "assignor" of the legal interest at issue because they have not owned any interest in over two decades. Further, the sale of Missouri Branson Label to Nekome is one transaction removed from Florida Branson Label's acquisition of the legal interest. Therefore, any consideration given to the Reas for the sale is not relevant to an analysis of the effective assignment of Missouri Branson Label's legal interest to Florida Branson Label through their merger.

Fourth, the timing of the merger in relation to the commencement of the instant case is suspicious. After Nekome acquired Missouri Branson Label on May 2, 2014, Florida Branson Label was created on May 8. The Branson Labels were then merged the next day on May 9, and Florida Branson Label filed this action in federal court

by May 14. This expedited timing is even more suspicious given that the advice of Elfant's tax advisors—that he merge Missouri Branson Label into an out-of-state corporation to avoid Missouri income taxes—did not require that the Branson Labels be merged in such haste. Missouri Branson Label had no income to be taxed at the time of Nekome's acquisition; any potential award from the inverse condemnation litigation would arguably come several months if not several years down the line. Also, the United States tax code allows several months for a corporation to elect to become an S-Corporation—another piece of advice from Elfant's advisors—and still take advantage of the tax advantages of S-Corporation status for that tax year. *See* 26 U.S.C. § 1362(b). Thus, Florida Branson Label has not met its burden to show that there was a legitimate business reason for its hasty merger with Missouri Branson Label; all of the purported tax purposes did not require such expeditious corporate maneuvers. The only logical explanation that we can see for the hurry was that the expedited timeline was necessary considering that the ten-year statute of limitations that applies to Missouri inverse condemnation proceedings was rapidly approaching. Because Florida Branson Label alleged in its complaint that Appellees broke ground on the Branson Landing on May 15, 2004, it had to file its action by May 14, 2014, to ensure that it was not outside the statute of limitations. *See* Mo. Rev. Stat. § 516.010. In other words, it had to merge with Missouri Branson Label as soon as it did to be able to file its action at all in federal court.[7]

The fifth and sixth factors do not carry significant weight in this particular case because these factors measure the extent that the assignor still controls and benefits from the litigation. In this case, the assignor—Missouri Branson Label—no longer exists. We nevertheless consider the indirect control that Nekome and Elfant maintain

---

[7]For this factor, we also consider Florida Branson Label's factual contention that its expedited merger was necessary because of the nearly year-long negotiation, delay, and eventual acquisition of Missouri Branson Label from the Reas. We appropriately give this contention its proper weight in considering the totality of the circumstances.

over the litigation as part of the totality of the circumstances. Moving to the seventh factor, Florida Branson Label denies any motivation to invoke diversity jurisdiction.[8]

Finally, Florida Branson Label attempts to rebut claims of its collusion to manufacture diversity by highlighting advice it received from its tax advisors. Elfant used Nekome to buy Missouri Branson Label because it "was deemed by [Elfant] to be an important element in the legal strategy to realize a success[] on [his] investment." Thus, he asked his tax advisors for their "recommendations regarding whether it would be advisable to reorganize [Missouri Branson Label] outside the State of Missouri." Considering the presumption of collusion, as well as the other circumstances that swing in favor of finding collusion, the district court did not err in finding that the advice of Elfant's tax advisors was a pretextual business purpose to mask the real intention of manufacturing diversity jurisdiction. Under these circumstances, we find no error in the district court's dismissal of this tax advice as a "make-weight."

Florida Branson Label also argues that it merged with Missouri Branson Label for the legitimate business purpose of administrative convenience. Thus, because Elfant operated ME Holdings and Nekome from his home in Florida, Florida Branson Label argues it made sense to incorporate the new company in Florida to centralize the operations of Elfant's corporations. This argument, however, is self-defeating because both ME Holdings and Nekome are Delaware LLCs. Elfant finds no trouble running these out-of-state companies from his home in Florida; similarly, running a Missouri corporation from a headquarters in Florida would have produced no burden

---

[8]This circumstance applies to admitted motivations. *See, e.g.*, *Toste Farms*, 70 F.3d at 642, 645 (party asserting jurisdiction admitted that merger was partly motivated by creating diversity jurisdiction). A court's discretion to infer the parties' real motivation from the totality of the circumstances is a separate analysis.

whatsoever. Similar to the "administrative convenience" argument that was rejected in *Toste Farm*, 70 F.3d at 642, Florida Branson Label's argument has no merit.[9]

### III. *Conclusion*

For the reasons stated above, the relevant circumstances justify the district court's finding that Florida Branson Label collusively manufactured diversity jurisdiction for the purpose of bringing the instant action in federal court. Accordingly, we affirm.

_____

_____

[9]Accordingly, we need not address any of the Appellees' alternative arguments for defeating subject-matter jurisdiction in this case, which largely address the merits of the case and the legality of Elfant running his businesses from his home in Florida.